UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------------------------------x

KIM M. BROWN,

                         Plaintiff,                     Civ

vs.

THE CITY UNIVERSITY OF NEW YORK,       **COMPLAINT AND JURY DEMAND**
RUDOLPH CREW individually as aider
and abettor, TANYA ISAACS, individually as
aider and abettor, and HILLARY KLEIN,
individually as aider and abettor,

                         Defendants.

-----------------------------------------------------------x

## NATURE OF THE ACTION

1.  This is an action under Title VII of the Civil Rights Act of 1964, 42 USC §§ 2000e et seq., to correct unlawful and discriminatory employment practices on the basis of Plaintiff's race, color, national origin, gender, and retaliation to provide appropriate relief to Kim M. Brown professionally known as Kimberlee Moorning and Kim Moorning Brown ("Plaintiff"), who was adversely affected by the defendants' discriminatory practices including termination.

## JURISDICTION AND VENUE

2.  Jurisdiction of this Court is invoked pursuant 42 USC § 2000e-5(f)(1) and (3) ("Title VII").  Plaintiff also invokes the supplemental jurisdiction of this Court in connection the state law claims.

3.  The alleged unlawful employment practices were committed within the jurisdiction of the United States District Court for the Eastern District of New York.

4.  The US Equal Employment Opportunity Commission (EEOC) Charge #520-2019-00773 was duly filed by Plaintiff in November 2018.  Plaintiff was mailed a Notice of Right to

1

Sue dated November 17, 2020, and received on November 20, 2020 (Exhibit A).

5. Plaintiff submitted a Notice of Claim to the New York State Attorney General Barbara Underwood on December 28, 2018 and the claim was not adjusted.

## PARTIES

6. Plaintiff is a black female and natural-born American citizen with generational ancestry in the United States. Plaintiff was an outstanding faculty member with The City University of New York between 1998 and 2019 for two decades, specifically at Medgar Evers College between 2003 and 2019. Plaintiff is an employee within the meaning of Title VII and the NYS Executive Law 291 et. seq. (NYSHRL) and the New York City Administrative Codes (NYCHRL).

7. At all relevant times, CUNY has continuously had at least 15 employees. CUNY has a principal place of business at 205 East 42nd Street, New York, NY 10017. CUNY is an employer within the meaning of Title VII and NYSHL and the New York City Administrative Codes (NYCHRL).

8. At all relevant times, Medgar Evers College a CUNY college, has continuously been an employer engaged in education doing business in the State of New York and the County of Kings and has continuously had at least 15 employees. Medgar Evers College has a principal place of business at 1650 Bedford Avenue, Brooklyn, NY 11225 and is an employer within the meaning of Title VII and NYSHR and the New York City Administrative Codes (NYCHRL).

9. At all relevant times, Defendant Rudolph Crew was acting individually as an aider and abettor has continuously been an employee of CUNY, and Medgar Evers College in the role of Medgar Evers College President and was a discriminating official and was also acting individually as an aider and abettor under the NYSHRL and NYCHRL.

10. At all relevant times, Defendant Tanya Isaacs was an employee of CUNY, and Medgar Evers College in the role of Medgar Evers College Labor Designee and was a discriminating official and was also acting individually as an aider and abettor under the NYSHRL and NYCHRL.

11. At all relevant times, Hillary Klein was an employee of CUNY, and Medgar Evers College in the role of CUNY Litigation Counsel and was a discriminating official and was also acting individually as an aider and abettor under the NYSHRL and NYCHRL.

12. The term "Defendants" is used to refer to all defendants collectively.

## STATEMENT OF FACTS

13. Plaintiff was an outstanding faculty member with CUNY between 1998 and 2019, which is documented by her annual reviews, but was improperly denied tenure, despite exceeding the tenure requirements, and being voted favorably for tenure by Medgar Evers College Personnel and Budget Committee in November 2018.

14. Plaintiff was hired by CUNY as a college professor in 1998, working as an adjunct college professor for ten years, the Director of Instructional Technology Services (hereinafter referred to as "ITS Dept") between 2003-2008, and a full-time faculty member between 2008-2019.

15. In 2008, Plaintiff was appointed as a full-time college professor in the rank of Assistant Professor with Ph.D. degree equivalencies.

16. Equivalencies are appointed to faculty based on their academic accomplishments and contractually become a permanent credential based on the college and university by-laws and governance. Employee appointments and salaries are posted in the Chancellor's report online on the CUNY portal website, accessible by all employees. Plaintiff's record of equivalences shows in

the June 2008 Chancellor's report online. The ITS Dept's Director position required at least a master's degree in Technology.

17. Soon after her hiring (2004-2008), the Provost began asking Plaintiff to work on special administrative and Technology projects for overtime pay, which exposed her to the college community as a Technology Expert. Plaintiff gained popularity for her technical abilities at the College.

18. For sixteen years, Plaintiff was reappointed, receiving high student scores (average of 4.8 of 5.0 scale), high faculty peer review scores (average of 4.5 of 5.0 scale), and favorable chairperson evaluations.

19. Between (2017 and 2018), Plaintiff again received student scores between (4.8 out of 5.0), and the new department Chairperson scored Plaintiff overall professional abilities with a rating of 4.75 out of a scale of 5.0, "strongly" recommending Plaintiff for tenure. In November 2018, the Medgar Evers College Personnel & Budget Committee recommended her for tenure.

20. Faculty candidates are approved for tenure based on two levels: acceptable and outstanding. CUNY's areas for tenure are known as the Nine Points of the Contract. It consists of three alphabetical areas (Area A, B C), each with three sub-areas. Plaintiff fulfilled each area of the nine points of the contract at the outstanding level.

    a. In Area A (Teaching and related instructional activities), Plaintiff exceeded the outstanding level by creating a 21st computer technology curriculum for the College, received extra credentials as a certified technical trainer, possessed software and technology skills in more than fifty (50) computing languages/applications, and organized student mentoring groups. Plaintiff's student and peer (faculty) evaluation scores for teaching activities were above 4.5 on the

4

scale of 5.0 every year.

b. In Area B (Research and scholarly writing), Plaintiff reached the outstanding level by exceeding the minimum of writing at least two journal articles or 1 article and a textbook chapter. Plaintiff authored three (3) textbooks, and fourteen (14) journal articles, presented research at twenty-one (21) conferences, helped the College receive nearly $500,000 in grant funding and wrote grant proposals for approximately $4,000,000 on behalf of the College.

c. In Area C (Public and professional service), Plaintiff reached the outstanding level by attending all department meetings and representing the department on behalf of the Chairperson due to his habitual absence. She was elected to lead and chair several college committees because of her outstanding skills. She even represented the College at its accreditation council and successfully co-led the College's School of Business to reaccreditation in the stead of a school dean. Plaintiff was only required to participate on one department committee, one college committee, and one community committee. Plaintiff served on sixteen (16) department and College committees and was a member and leader of twelve (12) technology and education professional associations.

21. Between 2003 and 2007, Plaintiff worked as an adjunct professor, Director of the ITS Department and worked on special assignments for the President's Office and the Office of the Academic Affairs (hereinafter referred to as "OAA").

22. In 2007, Plaintiff's popularity caused angst between her and her direct supervisor, the Vice President of Technology Michael FitzGerald, a white male (hereinafter referred to as "FitzGerald') whose background was in Philosophy, not Technology.

23. In 2007, FitzGerald began unfairly burdening Plaintiff's workload by asking her to build academic curriculum for the chief librarian, as he also supervised the library staff. Instead of compensating Plaintiff for the overloaded work, he denied the Plaintiff completed the job and told employees that the Chief librarian (a white female) had completed the work. Plaintiff complained to the OAA about FitzGerald's discrimination. In 2008, Medgar Evers College transferred FitzGerald to a full-time tenured position faculty member in the Department of Philosophy and Religion.

24. Due to Plaintiff's race and gender, FitzGerald demanded the removal of Plaintiff as the Director of ITS Dept and that she be replaced by Mr. Steve Wymore, a white Russian male who did not have a background in Technology, nor the academic degrees for the job. The job listing for the position required a master's degree for the position as Instructional Technology Director. He holds the position but does none of the work they required Plaintiff to perform.

25. Throughout 2003-2007, Plaintiff trained faculty members with creating online courses and issues technology certifications to the College. In 2008, when she left the position, Jennifer Sparrow (hereinafter referred to as "Sparrow"), a white female English teacher who the Plaintiff had trained to teach online courses, was promoted to Associate Provost of Technology although she did not have background in technology. Throughout Plaintiff's employment, CUNY and Medgar Evers College were discriminating against her and other black female employees in promotional opportunities and tenure.

26. Throughout 2008-2019, Plaintiff worked as a full-time assistant professor.

27. Upon information and belief, none of the faculty members at Medgar Evers College has a PhD in Computer Information Systems.

28. Upon information and belief, CUNY and Medgar Evers College never appointed

a female full-time faculty member in the CIS Dept for thirty-eight (38) years until the arrival of Plaintiff.  CUNY has never tenured a black female in the CIS Dept at Medgar Evers College.  CUNY has never tenured a black female at Medgar Evers College without first denying them tenure.

29. Upon information and belief, Medgar Evers College had never hired any natural born American citizen and females in the CIS Dept in a full-time faculty position.

30. Upon information and belief, the other members of the department are:

   a. Chris Castillo, Male Hispanic Russian (Ph.D. in Computer Science), Tenured Full Professor

   b. Sikiru Fadairo, Male African, (Ph.D. in Computer Science), Tenured Full Professor

   c. Leonid Knizhnik, Male Russian (Bachelor's degree and Certificate in Computer Science), Tenured Assistant Professor

   d. Orandel Robotham, Male Jamaican (1 Master's Degree in Management Information Systems), Medgar Evers College Tenure, Lecturer (Deceased in 2019)

   e. David Ahn, Male, Chinese, (Ph.D. in Computer Science), Tenured Full Professor hired in 2016.

   f. Gennady Lomako, Male, Russian, (Ph.D. in Computer Science), Assistant Professor hired in 2017.

31. Between 2013 and 2018, given the Plaintiff' solid credentials, in Technology, business, training, curriculum development, and teaching, she was given excessive work assignments with the promise of extra compensation.  Listed below are some of the overtime activities which the College assigned to Plaintiff:

   a. Designing an Office of Information Technology.
   b. Designing Computer Labs and Distance Education program.

  c. Training and certifying faculty for teaching online courses.
  d. Designing infrastructure for managing academic data.
  e. Creating a Faculty Training Institute (2013) because Mr. Wymore lacked the skills.
  f. Designing general education curriculum with technology elements.
  g. Creating an Information Technology Steering Committee to evaluate technology use.
  h. Overseeing curriculum development for Medgar Evers College.
  i. Designing a college self-study reaccreditation report and accreditation database (BASS).
  j. Designing a school self-study reaccreditation report and accreditation database (CACE).
  k. Working as the Deputy Chairperson CIS Department.
  l. Working as a Curriculum Coordinator to rewrite all college programs to conform with CUNY new Pathways' curriculum.
  m. Writing a master's degree program for Medgar Evers College School of Business.
  n. Training faculty members to publish and write grants.

32. The extra work assignments required additional compensation in the amount of $10,000 or summer salary in the amount of $3/9^{th}$ of Plaintiff's annual pay. Plaintiff was only partially compensated, and the College willfully delayed the paperwork. Her complaints about non-payment were met with delays.

33. According to CUNY's collective bargaining agreement, the academic work year shall be from September 1 through August 31. Employees on the teaching staff shall not be required to teach an excessive number of contact hours, assume an excessive student load, or be assigned an unreasonable schedule. Plaintiff is owed more than $50,000 in uncompensated work, which the Defendants refuse to pay.

34. Castillo, a faculty member, was asked by the college administrators to develop curriculum and assessment software and design technology classrooms for the College. Between 2009 and 2018, he engaged in a series of retaliatory activities to humiliate Plaintiff.

  a. During departmental meetings, Castillo told CIS Department faculty members in the meetings that Plaintiff was "only hired because she went to the same church as the President," which was utterly false and discriminatory

8

        stereotyping.

    b. Castillo harassed Plaintiff because he tried to sell a non-functional database to the College. Still, they chose to have Plaintiff develop the database, which received high recognition from the Middle States Commission of Higher Education.

    c. Plaintiff levied several complaints of discrimination with the department chairperson and school dean against Castillo, but no action was taken to prevent the hostile work environment.

    d. Castillo retaliated against becoming the acting department chairperson in 2013 and tried to stop Plaintiff from being reappointed at the annual faculty review meeting.

    e. Castillo again retaliated by refusing to sign for Plaintiff's CUNY contractual release time.

    f. Castillo gave preferential treatment to white adjunct faculty members by giving them classes. Plaintiff excelled in even though full-time faculty members have scheduling priority.

    g. Castillo changed Plaintiff's academic review scores on her peer review documentation to lower numbers than what had been awarded.

35. In 2013, Plaintiff filed a formal discrimination complaint based on race, gender, national origin, religion, and retaliation against Castillo, but could not get Medgar Evers College to investigate him.

36. The College's Chief Diversity Officer responsible for the investigation began having private meetings with Castillo, then physically pushed (accosted) Plaintiff to intimidate

her. Several faculty members pressured Plaintiff to rescind her complaint against Castillo, citing he would retaliate.

37. The lack of resolutions about the Plaintiff's complaints against co-workers forced her to work under duress between 2008 and 2019.

38. In 2014 and 2018, Castillo retaliated against Plaintiff in the tenure review by levying inaccuracies against Plaintiff to lower her standing to other faculty members.

39. Between 2017 and 2018, the Defendants gave Plaintiff an overloaded schedule and work assignments that would prevent her from attending college classes even after she complained and supplied them with evidence of the interference.

40. Between 2012-2014, Plaintiff was responsible for collecting and managing faculty credentials files for the Medgar Evers College School of Business reaccreditation report. Knizhnik's tenure resume to CUNY and Medgar Evers College claimed he held two master's degrees. The accreditation council required copies of college transcripts. Knizhnik provided Plaintiff with a bachelor's degree and a letter showing that his second schooling equated to a certificate. Knizhnik did not provide evidence of any master's degrees.

41. Plaintiff informed the College that she could not write a report with inaccuracies about Knizhnik's credentials. Tanya Serdiuk, a white Russian female who also worked on the accreditation committee, demanded that Plaintiff falsify Knizhnik's credentials to the Accreditation Council, but Plaintiff refused. The conversation was audio recorded. In retaliation, Ms. Serdiuk stopped Medgar Evers College from paying Plaintiff for her work on the reaccreditation committee and then personally submitted Knizhnik's falsified credentials to the accreditation council.

42. In or around the year 2015, a CIS Dept faculty search was conducted. Faculty

search committees include all full-time faculty members in the department. Castillo chaired the committee, and the result of the vote was to hire a black female candidate. Instead, Castillo altered the votes and presented a Russian white male, Gennady Lomako as the elected candidate to the President's office. In 2015, The College rejected Lomako, who was not hired.

43. In or around the year 2016, Professor Castillo formed a new committee of all white Russian males, excluding full-time faculty who were not Russian and all females. The all-white Russian male committee elected Lomako and Castillo presented him to President's Office for employment in the CIS Dept.

44. In 2017, Plaintiff wrote objections to Crew explaining the committee's racism, the hiring, and the futility of hiring another faculty with a Computer Science degree in the CIS Dept, without business experience, but Crew ignored Plaintiff's complaint and approved the hiring of Gennady Lomako.

45. Between 2017 and 2018, in retaliation, Plaintiff was repeatedly scheduled to work late evenings, in the Medgar Evers College's East New York middle school satellite campus (located in a high crime neighborhood). Only Plaintiff and black male adjuncts were assigned.

46. In the Spring 2018 semester, Plaintiff led a team of CIS Dept non-tenured faculty members in a pitch competition for a monetary award. Plaintiff's presentation caused the department to win. When the check arrived at the College, Castillo took all of the money and gave it to Lomako, including the Plaintiff's share.

47. Fadairo served as Plaintiff's direct supervisor between 2003 and 2014 as CIS Dept chairperson, although he was never elected.

48. Between 2012 and 2013, several students approached Plaintiff and informed her of Professor Fadairo's unwanted sexual advances towards them. Plaintiff told the students to file a

formal sexual harassment report.

49. Plaintiff reported the student complaints to the School of Business Dean, who told the former President William Pollard. To protect his job (against a tenured faculty vote of no confidence), President Pollard talked the students out of filing the sexual harassment complaint against Fadairo.

50. Plaintiff emailed the students and told them, "the next time go all the way."

51. To resolve the issue, the former President removed Fadairo from courses with students who levied charges against him and assigned them to Plaintiff. She was supposed to receive compensation for the extra classes. Additional female students asked Plaintiff to inflate their grades because Fadairo had promised them in exchange for sexual favors.

52. Fadairo retaliated by refusing to sign for Plaintiff to be compensated for the overload. Instead, he told Plaintiff she should have "never listened to the students or the president," then retaliated against Plaintiff. He also unilaterally demoted Plaintiff as Deputy Chair of the CIS Dept and refused to sign documentation for Plaintiff for her work as Deputy Chair.

53. In 2014, Fadairo assigned Plaintiff a teaching schedule on Sundays to interfere with her attending church. Plaintiff filed a grievance about working on Sundays, and her schedule was changed, citing religious discrimination.

54. In 2014, Fadairo continued his retaliation into the tenure process.

55. Plaintiff was scheduled for tenure review in November 2014 through a process that requires the department chairperson to hand-deliver copies of the candidate's credentials to the College's Personnel & Budget committee for approval.

56. Plaintiff's tenure credentials were comprised of five notebook binders showing her outstanding accomplishments. All other candidates only had one or two binders of credentials.

57. Fadairo altered the formal tenure process against Plaintiff and poisoned the committee against her.

58. In a recorded conversation, Fadairo told Plaintiff he "could not find your second master's degree" even though they were in the file with the College and could easily be verified through transcripts. She replied that she had copies, to which Fadairo replied, "it did not matter about her credentials, because the president (Crew) was going to side with him, and CUNY automatically sides with the president."

59. In 2018, Plaintiff complained to the Defendants, but they continued to discriminate against Plaintiff at every instance.

60. In November 2018, the Defendants violated several of the policies and guidelines for tenure.

61. CUNY By-Law Article 9 Sections 1 &.2, PSC/CUNY Contract Article 18.3 and CUNY General Policy 5.151 are the departmental meetings and voting procedures that state that the Personnel & Budget Committee is responsible for voting on reappointment and faculty tenure.

62. In November 2018, the Personnel & Budget committee voted in FAVOR of Plaintiff's tenure, but the Defendants failed to acknowledge the positive vote.

63. CUNY By-Law Article 11 Sections 5, 7 & 8 allow appointment without a doctoral degree when a faculty member holds equivalencies. Employment appointments and equivalencies are listed in the online CUNY Chancellor's report and is accessible by all employees. Plaintiff has equivalencies which the Defendants refused to acknowledge. Knizhnik does not have equivalencies nor a master's degree but was tenured with the rank of Assistant Professor.

64. PSC/CUNY Contract Article 19 required the College to protect employees' personnel files. Before the tenure vote and continuing to the present, the Defendants removed

credentials, outstanding employee evaluations, and degree equivalencies from her file.

65. Plaintiff was subjected to a hostile work environment that caused Plaintiff several serious medical issues to wit: heart attack, stress, diverticulitis, dehydration, hemorrhaging, and headaches.

66. PSC/CUNY Contract Article 15 states the procedures for employee workload. Between 2003 and 2018, Medgar Evers College consistently assigned Plaintiff a substantial amount of extra work, but she did not receive release time nor extra compensation.

67. CUNY By-Law Article 11 Section 5 states that "Equivalencies, once granted, are transferrable from college to college and do not need to be renewed upon subsequent personnel (tenure) actions." Plaintiff's degrees were evaluated for equivalencies in 2008 and she was appointed with equivalencies, which shows in the June 2008 CUNY Chancellor's report because her degrees are equivalent to a Ph.D. Knizhnik's appointment with tenure in the rank of assistant professor by the Defendants with only a bachelor's degree is prima facie evidence that a Ph.D. is not required for tenure and is evidence of discrimination. Defendants have applied a higher standard for Plaintiff than similarly situated males who are currently employed in the same jobs as Plaintiff.

68. CUNY By-Law Article 9 Section 5 states that the appointments to the full-time positions or a professorial title by the President must be to accordance with CUNY By-Law Article 11 Section 4, which requires the consulting of departmental and faculty committees on matters of appointments, reappointments, and promotions and the taking student evaluations into account. At no time did Crew consider the committee's approval for the Plaintiff's tenure or her outstanding student evaluations.

69. Plaintiff was denied tenure on November 19, 2018, and subsequently terminated on

14

January 26, 2019.

70. Upon information and belief, between 2014 and 2018, several other Black females were victims of discrimination.

71. Gale Gibson-Ballah worked for CUNY for more than fifteen (15) years and was an outstanding professor and Dean but was discriminated against by college administrators. Medgar Evers College was called "an animal house" and "school for scandal" because the College's Provost made nasty jokes to a pregnant Gibson-Ballah "questioning the paternity of her child" and sending out emails that described her and other female staffers as "sluts and whores." The email was sent to all staff members, students on campus, CUNY's Chancellor's office, and members of CUNY's Board of Trustees, but CUNY failed to protect a pregnant female who could have potentially miscarried her child due to the stress.

72. Evelyn Castro was an outstanding dean in the School of Liberal Arts and Education. After several years as Dean, Medgar Evers College told her she had to re-interview for her position, only to be terminated and replaced by a male dean. CUNY and Medgar Evers College took seven years before reinstating her employment.

73. Zulema Blair was an outstanding professor and department Chairperson before Medgar Evers College, and CUNY wrongfully terminated her. Professor Blair passed the tenure vote but was terminated based on defamatory statements that "she had a child with a student." The reports were proven false. Medgar Evers College never conducted an investigation. Blair had two young children when she was wrongfully terminated. Three years later, she was reinstated after she filed a series of lawsuits against Medgar Evers College and CUNY, including a second lawsuit to recover back pay according to the guidelines.

74. Upon information and belief, other Black female employees were terminated

15

through the discriminatory actions of the Defendants, which became worse when Crew was hired. There was a class-action lawsuit *Elsa Gulino et al. Plaintiffs, v. The Board of Education of the City School District of the City of New York,* Defendant in the United States District Court, of the Southern District of New York. Approximately 15,000 mostly female minority teachers suffered demotion, termination, and loss wages due to Crew's discriminatory practices, which CUNY was aware of before hiring him.

and the New York City Administrative Codes (NYCHRL).

### FIRST CLAIM FOR RELIEF-CUNY ONLY

75. Plaintiff repeats and realleges the allegations contained in the prior paragraphs with the same force and effect as if set forth herein.

76. Defendant CUNY engaged in discrimination against Plaintiff on the basis of being a black female and natural-born American citizen with generational ancestry in the United States and retaliation in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§2000e et seq., as amended by, the Civil Rights Act of 1991, in connection with the terms, conditions and privileges of her employment including the denial of her tenure and termination.

### SECOND CLAIM FOR RELIEF-CUNY ONLY

77. Plaintiff repeats and realleges the allegations contained in the preceding paragraphs with the same force and effect as if set forth herein.

Defendant CUNY engaged in unlawful discrimination against Plaintiff on the basis of being a black female and natural-born American citizen with generational ancestry in the United States and retaliation in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§2000e et seq., as amended by, among others, the Civil Rights Act of 1991, by, inter alia, subjecting Plaintiff to a hostile and abusive work.

## THIRD CLAIM FOR RELIEF

78. Plaintiff repeats and realleges the allegations contained in the preceding paragraphs with the same force and effect as if set forth herein.

79. Defendants and their agents engaged in unlawful discrimination against Plaintiff on the basis of being a black female and natural-born American citizen with generational ancestry in the United States and retaliation in violation of NYS HRL, NY Exec. L. §§290 et seq., and more particularly, NY Exec L. §296, in connection with the terms, conditions and privileges of her employment including but not limited to her termination.

## FOURTH CLAIM FOR RELIEF

80. Plaintiff repeats and realleges the allegations contained in the preceding paragraphs with the same force and effect as if set forth herein.

81. Defendants and their agents engaged in unlawful discrimination against Plaintiff on the basis of being a black female and natural-born American citizen with generational ancestry in the United States and retaliation, in violation of NYS HRL, NY Exec. L. §§290 et seq., and more particularly, NY Exec L. §296, by, inter alia, subjecting Plaintiff to a hostile and abusive work environment.

## FIFTH CLAIM FOR RELIEF

82. Plaintiff repeats and realleges the allegations contained in the preceding paragraphs with the same force and effect as if set forth herein.

83. Defendants engaged in unlawful discrimination against Plaintiff on the basis of being a black female and natural-born American citizen with generational ancestry in the United States and retaliation in violation of the NYCHRL, NYC Admin Code §§8-101 et seq., and more particularly NYC Admin Code §8-107(1), in connection with the terms, conditions and privileges

of her employment including but not limited to her termination of Plaintiff's employment.

## SIXTH CLAIM FOR RELIEF

84. Plaintiff repeats and realleges the allegations contained in the preceding paragraphs with the same force and effect as if set forth herein.

85. Defendants engaged in unlawful discrimination against Plaintiff on the basis of being a black female and natural-born American citizen with generational ancestry in the United States and retaliation in violation of the NYCHRL, NYC Admin Code §§8-101 et seq., and more particularly NYC Admin Code §8-107(q), by, inter alia, subjecting Plaintiff to a hostile and abusive work environment.

## **PRAYER FOR RELIEF**

Wherefore, the Plaintiff respectfully requests that this Court:

A. For equitable relief including retroactively reinstating Plaintiff with her tenure as an Assistant Professor effective immediately with in-service credit and pension contributions;

B. Back pay to compensate Plaintiff for lost wages and compensation for retroactive pay in compliance with the CUNY guidelines;

C. Job search expenses, medical expenses, loss of earning capacity, and lost future benefits;

D. Compensatory damages including damages for emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life, damaged reputation, and humiliation;

E. An Order to provide training to its officers, managers, and employees regarding discriminatory harassment and retaliation in the workplace;

F.  And award, the Plaintiff reasonable attorney fees and costs in this action and Grant such further relief as the Court deems necessary and proper in the public interest; and

## JURY TRIAL DEMAND

Plaintiff requests a jury trial on all questions of fact raised in her Complaint.

Dated: New York, New York
      February 17, 2021             STEWART LEE KARLIN
                                                              LAW GROUP, PC

                                                              */s/ Stewart Lee Karlin*
                                                              Stewart Karlin, Esq.
                                                              Attorney for Plaintiff
                                                              Stewart Lee Karlin Law Group, PC
                                                              111 John Street, 22nd Floor
                                                              New York, New York 10038
                                                              Tel: (212) 792-9670