UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------------------------------x

KIM M. BROWN,

                            Plaintiff,                         **21 Civ. 854 (PKC)(PK)**

      vs.

                                                    **AMENDED COMPLAINT AND**

THE CITY UNIVERSITY OF NEW YORK,        **JURY DEMAND**
And MEDGAR EVERS COLLEGE OF THE
CITY UNIVERSITY OF NEW YORK.

                          Defendants.

-----------------------------------------------------------x

## NATURE OF THE ACTION

1. This is an action under Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e et seq., to correct unlawful and discriminatory employment practices based on Plaintiff's race, color, national origin, gender, and retaliation in connection with her denial of tenure and termination.

## JURISDICTION AND VENUE

2. Jurisdiction of this Court is invoked pursuant 42 U.S.C. § 2000e-5(f)(1) and (3) ("Title VII"). Plaintiff also invokes the supplemental jurisdiction of this Court in connection with the state law claims.

3. Defendants' unlawful employment practices were committed within the jurisdiction of the United States District Court for the Eastern District of New York.

4. The U.S. Equal Employment Opportunity Commission (EEOC) Charge #520-2019-00773 was duly filed by Plaintiff in November 2018.  Plaintiff received the Notice of Right to Sue dated November 17, 2020, on November 20, 2020 (Exhibit A).

5. Plaintiff submitted a Notice of Claim to the New York State Attorney General Barbara

Underwood on December 28, 2018, and the claim was not adjusted.

## PARTIES

6. Plaintiff is a black female and natural-born American citizen with generational ancestry in the United States. Plaintiff was an outstanding faculty member with The City University of New York between 1998 and 2019 for two decades, specifically at Medgar Evers College between 2003 and 2019. Plaintiff is an employee within the meaning of Title VII and the N.Y.S. Executive Law 291 et. seq. (NYSHRL) and the New York City Administrative Codes (NYCHRL).

7. At all relevant times, CUNY has continuously had at least 15 employees. CUNY's principal place of business is at 205 East 42nd Street, New York, NY 10017. CUNY is an employer within the meaning of Title VII and NYSHL, and the New York City Administrative Codes (NYCHRL).

8. At all relevant times, Medgar Evers College, a CUNY college, has at least 15 employees. Medgar Evers College's principal place of business is at 1650 Bedford Avenue, Brooklyn, NY 11225. It is an employer within the meaning of Title VII and NYSHR and the New York City Administrative Codes (NYCHRL).

## RELEVANT BACKGROUND INFORMATION

9. Plaintiff was an outstanding faculty member with CUNY between 1998 and 2019, as reflected by her annual reviews, but was improperly denied tenure, despite exceeding the tenure requirements and being voted favorably for tenure by Medgar Evers College Personnel and Budget Committee in November 2018.

10. Plaintiff was hired by CUNY as a college professor in 1998, working as an adjunct college professor for ten years, the Director of Instructional Technology Services (hereinafter

2

referred to as "ITS Dept") between 2003-2008, and a full-time faculty member between 2008-2019.

11.  In 2008, Plaintiff was appointed as a full-time college professor with the rank of Assistant Professor with Ph.D. degree equivalencies.

12. Equivalencies are appointed to faculty based on their academic accomplishments and contractually become a permanent credential based on the college and university by-laws and governance.  Employee appointments and salaries are posted in the Chancellor's report online on the CUNY portal website, accessible by all employees. Plaintiff's record of equivalences shows in the June 2008 Chancellor's report online. The ITS Dept's Director position required at least a master's degree in Technology.

13. Soon after her hiring (2004-2008), the Provost began asking Plaintiff to work on special administrative and technology projects resulting in her building a reputation for her technical abilities at CUNY.

14. Plaintiff was reappointed by CUNY for sixteen years, receiving high student scores (average of 4.8 of 5.0 scale), high faculty peer review scores (average of 4.5 of 5.0 scale), and favorable chairperson evaluations.

15. Between 2003 and 2007, Plaintiff worked as an adjunct professor, Director of the ITS Department, and worked on special assignments for the President's Office and the Academic Affairs Office (hereinafter referred to as "O.A.A.").

16. In 2007, Plaintiff's popularity caused angst between her and her direct supervisor, the Vice President of Technology Michael FitzGerald, a white male (hereinafter referred to as "Fitzerald') whose background was in Philosophy, not Technology.

17. In 2007, FitzGerald began increasing Plaintiff's workload by asking her to build an

academic curriculum for the chief librarian, as he also supervised the library staff. Instead of compensating Plaintiff for the additional work, he denied the Plaintiff completed the job and told employees that the Chief librarian (a white female) had completed the work. Plaintiff complained to the O.A.A. about FitzGerald's discrimination. In 2008, Medgar Evers College transferred FitzGerald to a full-time tenured faculty member in the Department of Philosophy and Religion.

18. Due to Plaintiff's race and gender, FitzGerald demanded the removal of Plaintiff as the Director of ITS Dept. As a result, Plaintiff was replaced by Mr. Steve Wymore, a white Russian male who did not have a background in Technology or the academic degrees for the position. The job listing for the Instructional Technology Director position required a master's degree. Mr. Wymore held the position but did none of the work that Plaintiff had to perform.

19. Throughout 2003-2007, Plaintiff trained faculty members with creating online courses and issues technology certifications.

20. In 2008, when she left the position, Jennifer Sparrow (hereinafter referred to as "Sparrow"), a white female English teacher who the Plaintiff had trained to teach online courses, was promoted to Associate Provost of Technology, although she did not have a background in technology. Throughout Plaintiff's employment, CUNY and Medgar Evers College were discriminating against her and other black female employees in promotional opportunities and tenure.

21. In 2013, Plaintiff filed a formal discrimination complaint based on race, gender, national origin, religion, and retaliation against Castillo, but could not get Medgar Evers College to investigate him. The College's Chief Diversity Officer responsible for the investigation

4

began having private meetings with Castillo, then physically pushed (accosted) Plaintiff to intimidate her.   Several faculty members pressured Plaintiff to rescind her complaint against Castillo, citing he would retaliate.

22. The lack of resolutions about the Plaintiff's complaints against co-workers forced her to work under duress between 2008 and 2019.

23. Between 2012 and 2013, several students approached Plaintiff and informed her of Professor Fadairo's unwanted sexual advances towards them.  Plaintiff told the students to file a formal sexual harassment report.

24. Plaintiff reported the student complaints to the School of Business Dean, who told former President William Pollard.    To protect his job (against a tenured faculty vote of no confidence), President Pollard talked the students out of filing the sexual harassment complaint against Fadairo.

25. To resolve the issue, the former President removed Fadairo from courses with students who levied charges against him and assigned them to Plaintiff. She was supposed to receive compensation for the extra classes. Additional female students asked Plaintiff to inflate their grades because Fadairo had promised them in exchange for sexual favors.

26. Fadairo retaliated by refusing to sign for Plaintiff to be compensated for the extra work. Instead, he told Plaintiff she should have "never listened to the students or the president." He retaliated against Plaintiff by unilaterally demoting Plaintiff as Deputy Chair of the C.I.S. Dept and refusing to sign documentation for Plaintiff for her work as Deputy Chair.

27. Fadairo served as Plaintiff's direct supervisor between 2003 and 2014 as C.I.S. Dept.

28. In 2014, Fadairo assigned Plaintiff a teaching schedule on Sundays to interfere with her attending church.  Plaintiff filed a grievance about working on Sundays, and her schedule

was changed.

29. In 2014, Fadairo continued his retaliation into Plaintiff's tenure process.

30. Plaintiff was scheduled for tenure review in November 2014 through a process that requires the department chairperson to hand-deliver copies of the candidate's credentials to the College's Personnel & Budget committee for approval.

31. Plaintiff's tenure credentials comprised of five notebook binders showing her outstanding accomplishments. The other candidates had one or two binders. Fadairo altered the formal tenure process against Plaintiff and poisoned the committee against her.

32. In a recorded conversation, Fadairo told Plaintiff he "could not find your second master's degree" even though they were in the file with the College and could easily be verified through transcripts. She replied that she had copies, to which Fadairo replied, "it did not matter about her credentials because the president (Crew) was going to side with him, and CUNY automatically sides with the president."

33. Between 2012-2014, Plaintiff was responsible for collecting and managing faculty credentials files for the Medgar Evers College School of Business reaccreditation report. Knizhnik's tenure resume to CUNY and Medgar Evers College claimed he held two master's degrees. The accreditation council required copies of college transcripts. Knizhnik provided Plaintiff with a bachelor's degree and a letter showing that his second schooling equated to a certificate. Knizhnik did not provide evidence of any master's degrees.

34. Plaintiff informed the College that she could not write a report with inaccuracies about Knizhnik's credentials. Tanya Serdiuk, a white Russian female who also worked on the accreditation committee, demanded that Plaintiff falsify Knizhnik's credentials to the

Accreditation Council, but Plaintiff refused. In retaliation, Ms. Serdiuk stopped Medgar Evers College from paying Plaintiff for her work on the reaccreditation committee and then personally submitted Knizhnik's falsified credentials to the accreditation council.

35. In 2014 Castillo retaliated against Plaintiff in the tenure review by levying inaccuracies against Plaintiff to lower her standing to other faculty members.

36. In approximately 2015, a C.I.S. Department faculty search was conducted. Faculty search committees include all full-time faculty members in the department. Castillo chaired the committee, and the result of the vote was to hire a black female candidate. Instead, Castillo altered the votes and presented a Russian white male, Gennady Lomako as the elected candidate to the President's office. In 2015, The College rejected Lomako, who was not hired.

37. In or around the year 2016, Professor Castillo formed a new committee of all-white Russian males, excluding full-time faculty who were not Russian and all females. The all-white Russian male committee elected Lomako and Castillo and presented them to the President's Office for employment in the C.I.S. Dept.

38. In 2017, Plaintiff wrote objections to Crew explaining the committee's racism, the hiring, and the futility of hiring another faculty with a Computer Science degree in the C.I.S. Dept without business experience, but Crew ignored Plaintiff's complaint and approved the hiring of Gennady Lomako.

**INSTANT ACTION**

39. On or about January 18, 2017, Plaintiff signed a settlement agreement with Defendant releasing all previous claims against Defendants effective January 18, 2017. The agreement also explained that Plaintiff had to achieve certain education goals (Complete

his Ed. D degree and publish two scholarly articles) to receive tenure.  Plaintiff also was to be awarded her back pay. (See Exhibit "B")

40. However, despite the settlement agreement, Defendants continued with the discriminatory and retaliatory treatment towards Plaintiff.   Despite Plaintiff's multiple complaints regarding discrimination on the basis of race, national origin, gender and retaliation, Defendants ignored Plaintiff and blocked her from obtaining the additional credentials set in her statement of goals.  Defendants also did not honor the back pay owed to Plaintiff, denied her tenure, and ultimately terminated her as set forth below.

41. Between 2017 and 2018, the Defendants discriminated and retaliated against Plaintiff by overloading her schedule and work assignments so that she would be prevented from her from attending college classes even after she complained and supplied them with evidence of the interference.

42. More specifically, about one week after signing the agreement, Plaintiff received her teaching schedule on or about January 26, 2017.   On the same day, she complained about discrimination and retaliation and reported the schedule conflict with the required course for the doctoral course, which needs continuous enrollment.

43. Specifically, from January 26, 2017, to February 2, 2017, Plaintiff complained on multiple occasions to Tanya Isaacs, the Labor Designee, about discrimination (based on race, gender and national origin) and retaliation, but nothing was done.

44. For example, Plaintiff complained that she was given a schedule full of conflicts and very complicated as opposed to other male counterparts who were not African American such as Leonid Knizhnik (Male Russian), David Ahn (Male, Chinese),  Gennady Lomako (Male, Russian).  Despite this, Isaacs refused to change Plaintiff's schedule.  Plaintiff explained

that it was in direct conflict with her ability to obtain her professional goals as per the settlement agreement but this was ignored.

45. On or about January 31, 2017, Plaintiff asked the College to use the equivalencies, since Plaintiff had now had access to the online copy, and showed that they did exist, even though CUNY denied their existence.

46. On the same day, Plaintiff received a message back from Hilary Klein that "she did not care about [Plaintiff] already having doctoral equivalencies" or the "violation to the CUNY By-laws" in denying they existed because Plaintiff signed the agreement.

47. Thereafter, Plaintiff was asked to provide proof of her schedule and her research which Plaintiff complied on or about the same day.

48. On or about February 3, 2017, Plaintiff was given the responsibilities of helping faculty members author publications and write grants between 9:00 am and 9:00 pm on and off-campus. They could call anytime they wanted to.

49. On or about that day, Plaintiff asked Dean Joan Rolle, "if CUNY states Plaintiff did not author her publications, then why are they asking to help other faculty published?"

50. On or about February 2017, Plaintiff was given a sporadic schedule from morning to evening on campus resulting in Plaintiff being unable to attend the doctoral colloquium.

51. Due to the summer break, the next opportunity Defendant had to further discriminate and retaliate against Plaintiff was during the Fall semester of 2017.

52. Specifically, on or about August 2017, after already bringing it to their attention about the continuous enrollment in the Thursday evening doctoral colloquium, they again scheduled a conflict for Plaintiff to prevent her from achieving her target goals as per the agreement.

53. Plaintiff promptly reported the conflict to the Department Chairman Randy Robotham, but

the schedule was left unchanged. Plaintiff again complained about discrimination and retaliation based on race, gender and national origin. Plaintiff was scheduled Mondays and Wednesdays 1:00 pm – 6:45 pm, and Tuesdays and Thursdays 6:20 pm – 7:45 pm.

54. Due to this scheduling conflict, Plaintiff was unable to attend the doctoral colloquium. The semester ended in December 2017.

55. This discriminatory and retaliatory treatment was intentional as Defendant knew about the agreement, Plaintiff's target goals, and the schedule conflicts. However, the retaliatory treatment continued with scheduling conflicts and other conduct directed at Plaintiff.

56. In 2017 and 2018, Plaintiff complained many times on a continuous basis about the discrimination and retaliation to the Labor designee, the Chairman, the Dean and the Provost but nothing was done.

57. For example, in the Spring 2018 semester, Plaintiff led a team of C.I.S. Dept non-tenured faculty members in a pitch competition for a monetary award. Plaintiff's presentation was instrumental to the department winning the pitch competition. When the check arrived at the College, Castillo took all of the money and gave it to Lomako (Russian male) and Ahn (Chinese male), including Plaintiff's share. This was about $1,5000. Again, Plaintiff complained about discrimination and retaliation to no avail.

58. In January 2018, Plaintiff was again scheduled for Tuesdays and Thursdays, which conflicted with Plaintiff's school schedule. Plaintiff again complained about discrimination and retaliation.

59. Plaintiff by then had already realized that they were intentionally discriminating and retaliating against her by interfering with the terms of the agreement. They had full knowledge of the agreement, the scheduling conflicts, and Plaintiff's complaints, yet

persisted with the discriminatory and retaliatory treatment unlike with male, non-African American counterparts.

60. In May 2018, Plaintiff complained in writing about discrimination and retaliation to the college Provost and college President.  In her complaint, she explained the interference and lack of good faith, but they did not respond.  Plaintiff also complained to Dean Joan Rolle to no avail.

61. Upon information and belief, CUNY discriminated and retaliated against Plaintiff by pressuring Plaintiff to sign an agreement intentionally put up obstacles that would interfere with Plaintiff's ability to obtain the degree.

62. Put simply, CUNY discriminated and retaliated Plaintiff and further breached the agreement and the implied good faith dealing in the contract.

63. CUNY did not honor the agreement in that Plaintiff was blocked from obtaining her professional goals by creating constant conflicts between her schedule and her studies, and Plaintiff was not granted the back pay as per the agreement.

64. In fall 2008, Plaintiff was required to give the Provost an update.

65. In September 2018, Plaintiff met with the Provost to tell him about her progress report and  complained in person about the discrimination and retaliation she was suffering, specifically about Plaintiff's scheduling conflicts, the long day schedules, and the overloaded work assignments unlike her male non-African American counterparts.

66. Plaintiff also complained to the Provost about the equivalencies and that CUNY was not truthful when he said it did not exist.  The Provost told Plaintiff the "statement of goals" did not matter because other faculty members had also written a statement of goals and did not meet them, but they were still tenured.

67. In October 2018, Plaintiff found out from the Department Chair, who is required to review her evaluations for tenure and reappointment purposes, that Plaintiff's files were missing.

68. Nonetheless, the Chairman gave Plaintiff an outstanding recommendation for tenure.

69. Plaintiff provided nearly 1000 pages of research, publications, and numerous documents evidencing her credentials and the existence of the doctoral equivalencies.

70. By November 2018, the files to be used for tenure review were missing again. Plaintiff then uploaded the files for tenure review, but they were again missing. The Chairman then told Plaintiff to upload her documents through his account. Then, the Personnel & Budget Committee finally had Plaintiff's tenure portfolio and verified her credentials.

71. In November 2018, the Personnel & Budget Committee verified Plaintiff's credentials, and Plaintiff was approved for tenure by the College's Personnel and Budget committee.

72. Plaintiff had received high student scores for the year 2017-2018 (4.8 out of 5.0). Also, the new department Chairperson scored Plaintiff's overall professional abilities with a rating of 4.75 out of a scale of 5.0, "strongly" recommending Plaintiff for tenure.

73. Accordingly, in November 2018, the Medgar Evers College Personnel & Budget Committee recommended Plaintiff for tenure.

74. Faculty candidates are approved for tenure based on two levels: acceptable and outstanding. CUNY's areas for tenure are known as the Nine Points of the Contract. It consists of three alphabetical areas (Area A, B, and C), each with three sub-areas. Plaintiff fulfilled each area of the nine points of the contract at the outstanding level as follows.

75. In Area A (Teaching and related instructional activities), Plaintiff exceeded the outstanding level by creating a 21st computer technology curriculum for the College, received extra

credentials as a certified technical trainer, possessed software and technology skills in more than fifty (50) computing languages/applications, and organized student mentoring groups. Plaintiff's student and peer (faculty) evaluation scores for teaching activities were above 4.5 on the scale of 5.0 every year.

76. In Area B (Research and scholarly writing), Plaintiff reached the outstanding level by exceeding the minimum of writing at least two journal articles or 1 article and a textbook chapter.  Plaintiff authored three (3) textbooks, and fourteen (14) journal articles, presented research at twenty-one (21) conferences, helped the College receive nearly $500,000 in grant funding, and wrote grant proposals for approximately $4,000,000 on behalf of the College.

77. In Area C (Public and professional service), Plaintiff reached the outstanding level by attending all department meetings and representing the department on behalf of the Chairperson due to his absences. Plaintiff was elected to lead and chair several college committees because of her outstanding skills.    She even represented the College at its accreditation council and successfully co-led the College's School of Business to reaccreditation instead of a school dean.  Plaintiff was only required to participate on one department committee, one college committee, and one community committee.  Plaintiff served on sixteen (16) department and College committees and was a member and leader of twelve (12) technology and education professional associations.

78. However, despite meeting all the standards to obtain tenure, Castillo (male, Russian) discriminated against Plaintiff due to her race, gender, and retaliation against her for her previous protected activity by asserting inaccuracies about her.  For example, he asserted that Plaintiff  did not have the credentials to obtain  the job and that she only obtained

because she went to the same church as the same person who gave her the position .

79. Plaintiff had outstanding credentials in technology, business, training, curriculum development, and teaching. However, she was given excessive work assignments with the promise of extra compensation, which did not occur. In addition, the extra work conflicted with her ability to meet the professional goals listed in the settlement agreement.

80. Some of the overtime activities which the College assigned to Plaintiff and not to male non-African American Counterparts were::

(A)Designing an Office of Information Technology;

(B)Designing Computer Labs and Distance Education program;

(C)Training and certifying faculty for teaching online courses;

(D)Designing infrastructure for managing academic data;

(E)Creating a Faculty Training Institute (2013) because Mr. Wymore lacked the skills;

(F)Designing general education curriculum with technology elements;

(G)Creating an Information Technology Steering Committee to evaluate technology use;

(H)Overseeing curriculum development for Medgar Evers College;

(I)Designing a college self-study reaccreditation report and accreditation database (BASS);

(J)Designing a school self-study reaccreditation report and accreditation database (CACE);

(K)Working as the Deputy Chairperson C.I.S. Department;

(L)Working as a Curriculum Coordinator to rewrite all college programs to conform with CUNY new Pathways' curriculum;

(M)Writing a master's degree program for Medgar Evers College School of Business;

(N)Training faculty members to publish and write grants.

81. In addition, the extra work assignments required additional compensation of $10,000 or summer salary in the amount of 3/9th of Plaintiff's annual pay. Plaintiff was only partially

compensated, and the College willfully delayed the paperwork.  Her complaints about non-payment were met with delays.

82. According to CUNY's collective bargaining agreement, the academic work year shall be from September 1 through August 31.  Employees on the teaching staff shall not be required to teach an excessive number of contact hours, assume an excessive student load, or be assigned an unreasonable schedule.  Defendant owes Plaintiff more than $50,000 in uncompensated work, which the Defendants refused to pay.

83. Castillo, a faculty member, was asked by the college administrators to develop curriculum and assessment software and design technology classrooms.  Castillo engaged in a series of discriminatory and retaliatory activities to humiliate Plaintiff.

   a. During departmental meetings, Castillo told C.I.S. Department faculty members in the meetings that Plaintiff was "only hired because she went to the same church as the President," which was utterly false and discriminatory stereotyping.

   b. Castillo harassed Plaintiff because he tried to sell a non-functional database to the College. Still, they chose to have Plaintiff develop the database, which received high recognition from the Middle States Commission of Higher Education.

   c. Plaintiff levied several complaints of discrimination with the department chairperson (oral) and school dean against Castillo(oral), Dean Joan Rolle (oral), but Defendant took no action to prevent the discriminatory and retaliatory treatment.

   d. Castillo became the chairperson in 2013 and thereafter continuously tried to stop Plaintiff from reappointing her at the annual faculty review meeting.

   e. Castillo gave preferential treatment to white adjunct faculty members by giving

15

them classes that Plaintiff excelled in even though full-time faculty members have scheduling priority.   Lomako (Russian male) and Ahn (Chinese male) had preferential treatment over Plaintiff

84. In addition, between 2017 and 2018, Plaintiff was repeatedly scheduled to work late evenings in the Medgar Evers College's East New York middle school satellite campus (located in a high crime neighborhood), unlike his non-African American male counterparts (Lomako and Ahn)

85. In 2018, Plaintiff continuously complained to the Defendants (Dean, Provost and Department Chair), but they continued to discriminate against Plaintiff at every instance as set forth.

86. In November 2018, the Defendants violated several of the policies and guidelines for tenure.

87. CUNY By-Law Article 9 Sections 1 &.2, PSC/CUNY Contract Article 18.3 and CUNY General Policy 5.151 are the departmental meetings and voting procedures that state that the Personnel & Budget Committee is responsible for voting on reappointment and faculty tenure.

88. In November 2018, the Personnel & Budget committee voted *in favor* of Plaintiff's tenure, but the Defendants failed to acknowledge the favorable vote.

89. CUNY By-Law Article 11 Sections 5, 7 & 8 allow appointment without a doctoral degree when a faculty member holds equivalencies. Employment appointments and equivalencies are listed in the online CUNY Chancellor's report and are accessible by all employees. Plaintiff has equivalencies which the Defendants refused to acknowledge. Knizhnik does not have equivalencies nor a master's degree but was tenured with the rank of Assistant

Professor.

90. PSC/CUNY Contract Article 19 required the College to protect employees' personnel files. Before the tenure vote and continuing to the present, the Defendants removed credentials, outstanding employee evaluations, and degree equivalencies from her file.

91. Plaintiff was subjected to discrimination, retaliation and a hostile work environment that caused Plaintiff several serious medical issues to witstress, diverticulitis, dehydration, hemorrhaging, and headaches and was a significant contributing factor in Plaintiff's heart attack.

92. PSC/CUNY Contract Article 15 states the procedures for employee workload. Between 2003 and 2018, Medgar Evers College consistently assigned Plaintiff a substantial amount of extra work, but she did not receive release time nor additional compensation. This did not change after the 2017 agreement.

93. CUNY By-Law Article 11 Section 5 states that "Equivalencies, once granted, are transferrable from college to college and do not need to be renewed upon subsequent personnel (tenure) actions." Plaintiff's degrees were evaluated for equivalencies in 2008, and she was appointed with equivalencies, which shows in the June 2008 CUNY Chancellor's report because her degrees are equivalent to a Ph.D. Knizhnik's appointment with tenure in the rank of assistant professor by the Defendants with only a bachelor's degree is prima facie evidence that a Ph.D. is not required for tenure and is evidence of discrimination. Defendants have applied a higher standard for Plaintiff than similarly situated males who are currently employed in the same jobs as Plaintiff.

94. CUNY By-Law Article 9 Section 5 states that the appointments to the full-time positions or a professorial title by the President must be in accordance with CUNY By-Law Article

11 Section 4, which requires the consulting of departmental and faculty committees on matters of appointments, reappointments, and promotions and the taking student evaluations into account. At no time did Crew consider the committee's approval for the Plaintiff's tenure or her outstanding student evaluations.

95. Plaintiff was denied tenure on November 19, 2018, and subsequently terminated on January 26, 2019.

96. In December 2018, the President overrode the P&B vote.

97. Other Black females were also victims of discrimination by Defendant.

98. For example, Gale Gibson-Ballah worked for CUNY for more than fifteen (15) years and was an outstanding professor and Dean discriminated against by college administrators. Medgar Evers College was called "an animal house" and "school for scandal" because the College's Provost made nasty jokes to a pregnant Gibson-Ballah "questioning the paternity of her child" and sending out emails that described her and other female staffers as "sluts and whores."

99. Evelyn Castro was an outstanding dean in the School of Liberal Arts and Education. After several years as Dean, Medgar Evers College told her she had to re-interview for her position, only to be terminated and replaced by a male dean. CUNY and Medgar Evers College took seven years before reinstating her employment.

100. Zulema Blair was an outstanding professor and department Chairperson before Medgar Evers College, and CUNY wrongfully terminated her. Professor Blair passed the tenure vote but was terminated based on defamatory statements that "she had a child with a student." The reports were proven false. Medgar Evers College never conducted an investigation. Blair had two young children when she was wrongfully terminated. Three

18

years later, she was reinstated after she filed a series of lawsuits against Medgar Evers College and CUNY, including a second lawsuit to recover back pay according to the guidelines.

101. Throughout 2008-2019, Plaintiff worked as a full-time assistant professor.

102. Upon information and belief, none of the faculty members at Medgar Evers College has a PhD in Computer Information Systems.

103. Upon information and belief, CUNY and Medgar Evers College never appointed a female full-time faculty member in the C.I.S. Dept for thirty-eight (38) years until the arrival of Plaintiff.  CUNY has never tenured a black female in the C.I.S. Dept at Medgar Evers College.  CUNY has never tenured a black female at Medgar Evers College without first denying them tenure.

104. Upon information and belief, Medgar Evers College had never hired any natural-born American citizen and females in the C.I.S. Dept in a full-time faculty position.

105. Upon information and belief, the other members of the department are:

 a.  Chris Castillo, Male Russian (Ph.D. in Computer Science), Tenured Full Professor

 b.  Sikiru Fadairo, Male African, (Ph.D. in Computer Science), Tenured Full Professor

 c.  Leonid Knizhnik, Male Russian (Bachelor's degree and Certificate in Computer Science), Tenured Assistant Professor

 d.  Orandel Robotham, Male Jamaican (1 Master's Degree in Management Information Systems), Medgar Evers College Tenure, Lecturer (Deceased in 2019)

 e.  David Ahn, Male, Chinese, (Ph.D. in Computer Science), Tenured Full Professor hired in 2016.

 f.  Gennady Lomako, Male, Russian, (Ph.D. in Computer Science), Assistant

Professor hired in 2017.

106. All of these above members were in similar positions as Plaintiff, and upon information and belief were not subjected to the discriminatory and retaliatory treatment that Plaintiff and other African American colleagues were.

107. Upon information and belief, other Black female employees were terminated through the discriminatory actions of the Defendants, which became worse when Crew was hired. There was a class-action lawsuit *Elsa Gulino et al. Plaintiffs, v. The Board of Education of the City School District of the City of New York,* Defendant in the United States District Court, of the Southern District of New York. Approximately 15,000 mostly female minority teachers suffered demotion, termination, and loss wages due to Crew's discriminatory practices, which CUNY was aware of before hiring him.

108. Due to discrimination and retaliation, Plaintiff was terminated on January 26, 2019, without tenure.

## FIRST CLAIM FOR RELIEF

109. Plaintiff repeats and realleges the allegations contained in the prior paragraphs with the same force and effect as if set forth herein.

110. Defendant CUNY engaged in discrimination against Plaintiff based on being a black female and natural-born American citizen with generational ancestry in the United States and retaliation in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§2000e et seq., as amended by, the Civil Rights Act of 1991, in connection with the terms, conditions, and privileges of her employment including the denial of her tenure and termination.

20

**SECOND CLAIM FOR RELIEF**

111. Plaintiff repeats and realleges the allegations contained in the preceding paragraphs with the same force and effect as if set forth herein.

112. Defendant CUNY engaged in unlawful discrimination against Plaintiff based on being a black female and natural-born American citizen with generational ancestry in the United States and retaliation in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§2000e et seq., as amended by, among others, the Civil Rights Act of 1991, by, inter alia, subjecting Plaintiff to a hostile and abusive work.

**THIRD CLAIM FOR RELIEF**

113. Plaintiff repeats and realleges the allegations contained in the preceding paragraphs with the same force and effect as if set forth herein.

114. Defendants and their agents engaged in unlawful discrimination against Plaintiff on the basis of being a black female and natural-born American citizen with generational ancestry in the United States and retaliation in violation of NYS HRL, NY Exec. L. §§290 et seq., and more particularly, N.Y. Exec L. §296, in connection with the terms, conditions, and privileges of her employment, including but not limited to her termination.

**FOURTH CLAIM FOR RELIEF**

115. Plaintiff repeats and realleges the allegations contained in the preceding paragraphs with the same force and effect as if set forth herein.

116. Defendants and their agents engaged in unlawful discrimination against Plaintiff on the basis of being a black female and natural-born American citizen with generational

ancestry in the United States and retaliation, in violation of NYS HRL, NY Exec. L. §§290 et seq., and more particularly, N.Y. Exec. L. §296, by, inter alia, subjecting Plaintiff to a hostile and abusive work environment.

## FIFTH CLAIM FOR RELIEF

117. Plaintiff repeats and realleges the allegations contained in the preceding paragraphs with the same force and effect as if set forth herein.

118. Defendants engaged in unlawful discrimination against Plaintiff on the basis of being a black female and natural-born American citizen with generational ancestry in the United States and retaliation in violation of the NYCHRL, N.Y.C. Admin Code §§8-101 et seq., and more particularly N.Y.C. Admin Code §8-107(1), in connection with the terms, conditions, and privileges of her employment including but not limited to her termination of Plaintiff's employment.

## SIXTH CLAIM FOR RELIEF

119. Plaintiff repeats and realleges the allegations contained in the preceding paragraphs with the same force and effect as if set forth herein.

120. Defendants engaged in unlawful discrimination against Plaintiff based on being a black female and natural-born American citizen with generational ancestry in the United States and retaliation in violation of the NYCHRL, N.Y.C. Admin Code §§8-101 et seq., and more particularly N.Y.C. Admin Code §8-107(q), by, inter alia, subjecting Plaintiff to a hostile and abusive work environment.

## PRAYER FOR RELIEF

Wherefore, the Plaintiff respectfully requests that this Court:

    A. For equitable relief including retroactively reinstating Plaintiff with tenure as an

Assistant Professor effective immediately with in-service credit and pension contributions;

B. Back pay to compensate Plaintiff for lost wages and compensation for retroactive pay in compliance with the CUNY guidelines;

C. Job search expenses, medical expenses, loss of earning capacity, and lost future benefits;

D. Compensatory damages including damages for emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life, damaged reputation, and humiliation;

E. An Order to provide training to its officers, managers, and employees regarding discriminatory harassment and retaliation in the workplace;

F. And reasonable attorney fees and costs in this action and grant such further relief as the Court deems necessary and proper in the public interest; and

## JURY TRIAL DEMAND

Plaintiff requests a jury trial on all questions of fact raised in her Complaint.

Dated: New York, New York
      May 03, 2021

STEWART LEE KARLIN
LAW GROUP, PC

/s/ Stewart Lee Karlin
Stewart Karlin, Esq.
Natalia Kapitonova, Esq.
Attorneys for Plaintiff
Stewart Lee Karlin Law Group, PC
111 John Street, 22nd Floor
New York, New York 10038
Tel: (212) 792-9670