UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
--------------------------------------------------------x
KIM M. BROWN,

                Plaintiff,

          - against -

CITY UNIVERSITY OF NEW YORK,

                Defendant.
--------------------------------------------------------x

**MEMORANDUM & ORDER**

21-CV-854 (PKC) (MMH)

PAMELA K. CHEN, United States District Judge:

      Plaintiff Kim M. Brown, a former tenure-track professor at Medgar Evers College (the "College"), one of the constituent senior colleges of the City University of New York ("CUNY"), asserts claims against CUNY[1] for discrimination against her on the basis of race, gender, and national origin; retaliation against her for reporting such discrimination; and subjecting her to a hostile work environment, in violation of Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. §§ 2000e *et seq.*; New York State Human Rights Law ("NYSHRL"), N.Y. Exec. Law §§ 290 *et seq.*; and New York City Human Rights Law ("NYCHRL"), N.Y.C. Admin. Code §§8-101 *et seq.* (*See generally* Amended Complaint ("Am. Compl."), Dkt. 13.) Currently pending before the Court is Defendant's motion to dismiss all of Plaintiff's claims pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure. (Defendant's Motion to Dismiss for Failure to State a Claim, Dkt. 22.)

---

[1] CUNY is the entity with the capacity to sue or be sued, and it is the proper institutional defendant. The College is a senior college of CUNY with no separate legal existence. *See* N.Y. Education Law ¶¶ 6202(5), 6203. Although Plaintiff named the College as a defendant in her Amended Complaint, she subsequently informed the Court that she would "withdraw the claim[s] against Medgar Evers College," so the only remaining Defendant is CUNY. (*See* Dkt. 16.)

For the reasons discussed below, Defendant's motion to dismiss is granted in part and denied in part.  With respect to the Title VII claims, the Court grants Defendant's motion to dismiss Plaintiff's hostile work environment claim and the discrimination claim on the basis of national origin, but denies the motion as to Plaintiff's discrimination claims on the bases of race and gender, and the retaliation claims.  To the extent that Plaintiff still asserts NYCHRL or NYSHRL claims against CUNY, those claims are dismissed based on state sovereign immunity.

## BACKGROUND

### I.    Factual Background

### A.    Initial Allegations of Discrimination and Settlement

Plaintiff is a Black woman who first started working at CUNY in 1998 as an adjunct college professor.  (Am. Compl., Dkt. 13, ¶¶ 6, 9–10.)  Starting in 2003, Plaintiff took on the role of the Director of Instructional Technology Services and began working directly for the College.  (*Id.* ¶¶ 6, 10.)  In 2008, Plaintiff was appointed as a full-time assistant professor for the College.  (*Id.* ¶ 11.)

Plaintiff alleges that starting in 2007, various members of CUNY's faculty discriminated against her on account of her gender, race, and national origin.  (*Id.* ¶¶ 17–20, 36–38.)  Plaintiff also claims that between 2013 and 2014 she was retaliated against after complaining about the discrimination she experienced and for reporting complaints that female students were subject to sexual harassment by a tenured faculty member.  (*Id.* ¶¶ 21–35.)  Plaintiff claims that she was subjected to discrimination and retaliation in the form of faculty members not approving paperwork needed for her to be "compensated for the extra work" she took on, assigning her to teach on Sundays (which made it difficult for her to attend religious services), "alter[ing] the formal tenure process" to make it more difficult for her to receive tenure, and "levying inaccuracies

against Plaintiff to lower her standing [in front of] other faculty members." (*Id.* ¶¶ 21, 26, 28, 31, 35.)

In November 2014, Plaintiff was up for tenure. (*Id.* ¶ 30.) Plaintiff alleges that one of the professors who interfered with her tenure application told her in a conversation that Plaintiff recorded that her credentials "did not matter," since the College's "[P]resident (Crew) was going to side with him," in opposing her tenure application, "and CUNY automatically sides with the president." (*Id.* ¶ 32.) Ultimately, Plaintiff did not receive tenure, and in 2015, she was discharged from her position. (*See* U.S. Equal Employment Opportunity Commission (EEOC), Notice of Right to Sue*, dated Nov. 16, 2020, Compl., Dkt. 1, Ex. A.)[2]

Sometime on or around March 21, 2016, Plaintiff initiated arbitration proceedings regarding her initial denial of tenure in 2014. (*See* Declaration of Clement J. Colucci, dated June 25, 2021, Dkt. 23-1, Ex. A[3], at 1.) On or about January 18, 2017, Plaintiff signed a settlement agreement ("Settlement") with CUNY releasing all previous claims against it. (Am. Compl., Dkt.

---

[2] Plaintiff attached as an exhibit to her original complaint the EEOC Notice of Right to Sue letter that she received on November 17, 2020. However, Plaintiff did not resubmit this letter when filing her Amended Complaint. An amended pleading will "ordinarily supersede[] the original and renders it of no legal effect." *In re Crysen/Montenay Energy Co.*, 226 F.3d 160, 162 (2d Cir. 2000). Therefore, "exhibits attached to the Complaint (but not attached to the Amended Complaint) are not available for consideration by the Court." *See Atlas Partners, LLC v. STMicroelectronics, Intern. N.V.*, No. 14-CV-7134 (VM), 2015 WL 4940126, at *7 n.3 (S.D.N.Y. Aug. 10, 2015). For the purposes of adjudicating this motion to dismiss, however, this Court can take judicial notice of the EEOC determination as a public record. *See Frederick v. JetBlue Airways Corp.*, 14-CV-7238 (DLI) (RER), 2016 WL 1306535, at *5 (E.D.N.Y. Mar. 31, 2016) (collecting cases).

[3] Exhibit A to Colucci's declaration is the Settlement Agreement between the parties. Although submitted by Defendants, the Court references and relies on it as a document incorporated by reference in Plaintiff's Amended Complaint. *See Chambers v. Time Warner, Inc.*, 282 F.3d 147, 152–53 (2d Cir. 2002) (explaining that for purposes of a motion to dismiss, the operative complaint "is deemed to include any written instrument attached to it as an exhibit or any statements or documents incorporated in it by reference") (citations and quotations omitted).

13, ¶ 39.)  In exchange, Plaintiff was granted a two-year extension on her tenure-track period, running from January 2017 to the end of 2018. (Settlement, Dkt. 23-1, Ex. A, at 6.)  The Settlement also provided that Plaintiff would be considered for tenure if she obtained her Doctorate in Education (Ed.D) degree and published two scholarly articles in the next two years. (*See* Am. Compl., Dkt. 13, ¶ 39; *see also* Settlement, Dkt. 23-1, Ex. A, at 1–2, 6.)

### B.    Allegations of Discrimination and Retaliation after the Settlement

Plaintiff claims that "despite the settlement agreement, Defendant[] continued with the discriminatory and retaliatory treatment towards Plaintiff" by "block[ing] her from obtaining the additional credentials" and "not honor[ing] the back pay owed" to Plaintiff. (*Id.* ¶ 40.)  Plaintiff alleges that Defendant accomplished this by "overloading her schedule and work assignments[,]" so she would be unable to finish the courses needed for her Ed.D degree. (*Id.* ¶ 41.)

Plaintiff alleges that she complained on "a continuous basis" in 2017 and 2018 to the College Provost and the Dean about the fact that her teaching schedule interfered with her required coursework for her doctoral program, and that CUNY was engaged in discriminatory and retaliatory conduct by giving her a teaching schedule with these conflicts. (*Id.* ¶¶ 56, 85.) Specifically, Plaintiff alleges the following:

- On or about January 26, 2017, Plaintiff received a teaching schedule that conflicted with the course required for her completion of her doctoral degree. (*Id.* ¶ 42.)  That same day Plaintiff complained to Tanya Isaacs, CUNY's Labor Designee, that her schedule was "full of conflicts" and "very complicated as opposed to other male counterparts who were not African American," namely, Leonid Knizhik, David Ahn, and Gennady Lomako. (*Id.* ¶¶ 43–44.) Plaintiff lodged several more complaints to Isaacs between January 26, 2017 and February 2, 2017, but Plaintiff's schedule for that semester remained the same. (*Id.* ¶ 43.)

- In August 2017, Plaintiff received another schedule (presumably for the Fall 2017 semester) that contained a conflict with her required doctoral coursework. (*Id.* ¶ 52.)  She "promptly reported the conflict" to her department chairperson, Randy Robotham, but the schedule was left unchanged, and she was unable to attend the doctoral colloquium that semester. (*Id.* ¶¶ 53–54.)

4

- In January 2018, Plaintiff "again complained about discrimination and retaliation" after she was scheduled to teach class each Tuesday and Thursday for the Spring 2018 semester, which again created conflicts with Plaintiff's doctoral program schedule.  (*Id.* ¶ 58.)[4]

- In May 2018, Plaintiff complained in writing about discrimination and retaliation she allegedly experienced—including how her teaching schedules continued to interfere with her ability to complete the requirement for her doctoral program—to the College Provost and the College President.  (*Id.* ¶ 60.)[5]

- In September 2018, Plaintiff "met with the Provost" and during that meeting "complained in person about the discrimination and retaliation she was suffering specifically about [her] scheduling conflicts."  (*Id.* ¶ 65.)

Plaintiff also alleges that she complained about other ways in which she experienced discriminatory treatment relative to non-Black, male colleagues.  (Am. Compl., Dkt. 13, at ¶ 57.) According to Plaintiff, a supervisor redirected Plaintiff's $1,500 share of a monetary award for winning a competition that she had worked on to Professors Lomako and Ahn.  (*Id.*)[6]

In addition, Plaintiff alleges that she was "given the responsibilities of helping faculty members author publications and write grants between 9:00 am and 9:00 pm on and off-campus," and that she was "given a sporadic schedule" which resulted in her being unable to attend a doctoral colloquium.  (*Id.* ¶¶ 48–54.)  Plaintiff was also asked to undertake several "overtime" assignments that were not assigned to male, non-African-American colleagues.  (*Id.* ¶ 80.)  These work assignments included, *inter alia*, "Creating a Faculty Training Institute (2013)" because a

---

[4] The Amended Complaint does not specify when or to whom she lodged these complaints about the Spring 2018 schedule.  (*See* Am. Compl., Dkt. 13, ¶ 58.)

[5] Plaintiff alleges she also complained to "Dean Joan Rolle" but does not include any details on when this complaint was made and whether Plaintiff specifically mentioned the scheduling issues.  (*See* Am. Compl., Dkt. 13, ¶ 60.)

[6] The Amended Complaint alleges that the share was "$1,5000."  (*See* Am. Compl., Dkt. 13, at ¶ 57.)  Although the Court assumes for the purposes of this motion that the amount was $1,500, and not $15,000, the difference is immaterial for the outcome of this motion.

supervisor "lacked the skills" to do so, and "Working as the Deputy Chairperson [of the Computer Information Systems ('C.I.S.')] Department." (*Id.* ¶ 80.) Plaintiff claims that she is owed over $50,000 in uncompensated labor. (*Id.* ¶ 82.) Plaintiff lodged at least one complaint about these overtime assignments, raising the issue during her September 2018 meeting with the Provost of the College. (*Id.* ¶ 65.)

Per the terms of the Settlement, Plaintiff was up for tenure again at the end of 2018. Faculty candidates at CUNY are evaluated for tenure in nine different areas, and Plaintiff alleges that she "fulfilled each . . . of the nine [areas] . . . at the outstanding level," which is the highest possible evaluation mark. (*Id.* ¶ 74.)[7] The College's Personnel & Budget Committee recommended Plaintiff for tenure, and the Chairman of her department "strongly" recommended her for tenure. (*Id.* ¶¶ 71–3, 88.) Notwithstanding these positive recommendations, CUNY denied Plaintiff tenure for the second time on or around November 19, 2018. (*See id.* ¶ 95.) On January 26, 2019, CUNY terminated Plaintiff's employment. (*See id.*)

---

[7] Plaintiff states that she "reached the outstanding level" in each of the nine areas in which tenure candidates are evaluated. (Am. Compl., Dkt. 13, at ¶¶ 74–76.) But the Court acknowledges that the way these allegations are phrased is vague, such that it is unclear whether Plaintiff is claiming that she actually received an "outstanding" mark from the committee reviewing her tenure application in each of the nine areas, or whether Plaintiff in her opinion deserved an "outstanding" mark. In light of the Court's obligation at this stage to "accept as true the factual allegations of the complaint, and construe all reasonable inferences that can be drawn from the complaint in the light most favorable to the plaintiff," *Arar v. Ashcroft*, 585 F.3d 559, 567 (2d Cir. 2009), the Court interprets this allegation to mean that Plaintiff actually received "outstanding level" marks from her colleagues.

## II.      Procedural Background

Plaintiff filed a charge with the EEOC in November 2018.  The EEOC issued a Notice of Right To Sue, dated November 17, 2020, which Plaintiff received on November 20, 2020.  (Am. Compl., Dkt 13, ¶ 4.)[8]

Plaintiff filed this lawsuit on February 17, 2021, less than 300 days after receiving the EEOC Right to Sue Letter, asserting Title VII, NYCHRL, and NYSHRL claims against Defendant CUNY. [9]  (*See* Complaint, Dkt. 1.)  The Complaint sought relief in the form of back pay for lost wages; compensatory damages for emotional pain, suffering, and damage to her reputation; an order for Defendant to provide training to its officers, managers, and employees regarding discriminatory workplace harassment and retaliation; and Plaintiff's retroactive reinstatement as a tenured professor.  (*See* Compl., Dkt. 1, at ¶¶ 18–19.)

On March 31, 2021, Defendant filed a letter requesting a pre-motion conference for a motion to dismiss, arguing, *inter alia*, that any of Plaintiff's claims arising before January 2017 were barred by the Settlement.  (*See* Dkt. 10.)  Plaintiff thereafter filed an amended complaint bringing the same cause of actions against CUNY and the College, while including additional factual allegations related to the Settlement signed between the parties in 2017.  (*See* Am. Compl., Dkt. 13.)

---

[8] Plaintiff also alleges that she "submitted a Notice of Claim to the New York State Attorney General . . . on December 28, 2018, and the claim was not adjusted."  (Am. Compl., Dkt. 13, ¶5.)  However, "there is no exhaustion requirement [for administrative remedies] under the NYSHRL and NYCHRL," as there is for Title VII.  *Cherry v. N.Y.C. Hous. Auth.*, 564 F. Supp. 3d 140, 164 n.12 (E.D.N.Y. 2021).

[9] The original Complaint also named as defendants Rudolph Crew, the President of Medgar Evers College during some of the operative events, and two of Plaintiff's supervisors, all in their individual capacities and as an aider and abettor under the NYSHRL and NYCHRL claims.  (*See* Compl., Dkt. 1, ¶¶ 9–11.)  In her Amended Complaint, Plaintiff dropped all three individual defendants from this action.  (*See generally* Am. Compl., Dkt. 13.)

Defendant filed another pre-motion conference letter on May 18, 2021. (Dkt. 14.) In response, Plaintiff submitted a letter to the Court on May 25, 2021, noting that "Plaintiff is not asserting any claims before signing the [Settlement]" and asking the Court to consider "the relevant history in connection with Plaintiff's discrimination and retaliation claims." (*See* Dkt. 16.) In the same letter, Plaintiff informed the Court that she was dropping her NYCHRL claims. (*See id.*)

On June 25, 2021, Defendant moved to dismiss the Amended Complaint pursuant to Rule 12(b)(6) for failure to state a claim. (*See generally* Memorandum of Law in Support of Defendant's Motion to Dismiss the Amended Complaint ("Def.'s Mem."), Dkt. 24.) On August 16, 2021, Plaintiff served her memorandum in opposition to Defendant's motion to dismiss. (*See* Plaintiff's Opposition ("Pl.'s Opp."), Dkt. 26.) In that opposition, Plaintiff explained that she "is withdrawing her claim[s] under the New York State Human Rights Law." (*See id.*, Dkt. 26, at 1 n.1.) On September 13, 2021, Defendant filed its reply memorandum of law in further support of Defendant's motion to dismiss the amended complaint. (*See* Defendant's Reply ("Def.'s Rep."), Dkt. 27.)[10]

## LEGAL STANDARDS

### I.   Rule 12(b)(6) Motions

To survive a motion to dismiss pursuant to Rule 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544,

---

[10] In accordance with the Court's scheduling order, the parties filed all of their motion papers on ECF on September 13, 2021, the date when the motion was fully briefed. (*See* 6/4/2021 Docket Order; *see also* Dkt. 18 (letter from Defendant dated June 25, 2021, memorializing electronic service of Defendant's motion to dismiss papers); Dkt. 21 (letter from Plaintiff dated August 16, 2021, memorializing electronic service of Plaintiff's opposition to the motion to dismiss).)

570 (2007)).  A "claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (quoting *Twombly*, 550 U.S. at 556).  The "plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.* (quoting *Twombly*, 550 U.S. at 556).

Determining whether a complaint states a plausible claim for relief is "a context-specific task that requires the reviewing court to draw on its judicial experience and common sense."  *Id.* at 679.  In addressing the sufficiency of a complaint, courts are required to accept the well-pleaded factual allegations contained within the complaint as true, *see Bldg. Indus. Elec. Contrs. Ass'n ex rel. United Elec. Contrs. Ass'n v. City of New York*, 678 F.3d 184, 188 (2d Cir. 2012), but "need not credit conclusory statements unsupported by assertions of facts[,] or legal conclusions . . . presented as factual allegations," *see In re Livent, Inc. Noteholders Sec. Litig.*, 151 F. Supp. 2d 371, 404 (S.D.N.Y. 2001) (citing *Papasan v. Allain*, 478 U.S. 265, 286 (1986)).  In addressing the sufficiency of a complaint, courts must "accept as true the factual allegations of the complaint, and construe all reasonable inferences that can be drawn from the complaint in the light most favorable to the plaintiff."  *Arar v. Ashcroft*, 585 F.3d 559, 567 (2d Cir. 2009).  However, a court "need not feel constrained to accept as truth conflicting pleadings that make no sense, or that would render a claim incoherent, or that are contradicted either by statements in the complaint itself or by documents upon which its pleadings rely, or by facts of which the court may take judicial notice." *In re Livent, Inc. Noteholders Sec. Litig.*, 151 F. Supp. 2d at 405–06 (citations omitted).

At the pleadings stage, a court must limit its inquiry to the facts alleged in the complaint, the documents attached to the complaint or incorporated therein by reference, and "documents that, while not explicitly incorporated into the complaint, are 'integral' to [the] plaintiff's claims

and were relied upon in drafting the complaint." *Id.* at 404 (citing *Cortec Indus., Inc. v. Sum Holding L.P.*, 949 F.2d 42, 44 (2d Cir. 1991)). Thus, in employment discrimination cases, courts may consider filings with state administrative agencies or the EEOC to the extent that a complaint necessarily rests upon them. *See Littlejohn v. City of New York*, 795 F.3d 297, 305 n.3 (2d Cir. 2015) ("'It is proper for this court to consider the plaintiff's relevant filings with the EEOC' and other documents related to the plaintiff's claim . . . so long as those filings are . . . 'integral to' and 'solely relied' upon by the complaint.") (cleaned up) (quoting *Holowecki v. Fed. Express Corp.*, 440 F.3d 558, 565–66 (2d. Cir. 2006)).

## II.     Title VII Discrimination Claim

Employment discrimination claims asserted under Title VII are analyzed under the burden-shifting framework of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). Under the *McDonnell Douglas* framework, the plaintiff must establish a *prima facie* case of discrimination by showing that: (1) she is a member of a protected class; (2) she was qualified for the position she held; (3) she suffered an adverse employment action; and (4) the adverse action's circumstances give rise to an inference of discrimination. *See Littlejohn*, 795 F.3d at 307.

At the motion to dismiss stage, district courts "treat[] the elements of a *prima facie* case as 'an outline of what is necessary to render a plaintiff's employment discrimination claims for relief plausible.'" *Sosa v. N.Y.C. Dep't of Educ.*, 368 F. Supp. 3d 489, 495 (E.D.N.Y. 2019) (quoting *Barrett v. Forrest Labs., Inc.*, 39 F. Supp. 3d 407, 429 (S.D.N.Y. 2014)). In other words, a "plaintiff is not required to plead a *prima facie* case under *McDonnell Douglas* . . . to defeat a motion to dismiss." *Vega v. Hempstead Union School Dist.*, 801 F.3d 72, 84 (2d Cir. 2015). This is because the *prima facie* requirement in *McDonnell Douglas* is an evidentiary standard that only applies at the summary judgment phase, not a pleading requirement. *Id.* at 83 (citing *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 510 (2002)). Thus, to survive a motion to dismiss, a complaint need

10

only "give the defendant fair notice of what the plaintiff's claim is and the grounds upon which it rests." *Swierkiecwicz*, 534 U.S. at 512.

The Second Circuit has "recently emphasized the low bar" for a claim of discriminatory acts under Title VII to survive a motion to dismiss. *See Lewis v. Roosevelt Island Operating Co.,* 246 F. Supp. 3d 979, 989 (S.D.N.Y. 2017) (citing *Doe v. Columbia Univ.*, 831 F.3d 46, 55 n.8 (2d Cir. 2016) (collecting cases in which the court of appeals vacated dismissals on appeal)); *see also Tori v. Marist College*, No. 06-CV-419 (KMK), 2008 WL 11451434, at *7 (S.D.N.Y. Sept. 11, 2008) (noting that if a plaintiff can establish "a prima facie case of discrimination—a minimal burden—a presumption of discrimination arises"). The plaintiff's burden to plead discriminatory intent requires only that the complaint give "plausible support to a minimal inference of discriminatory motivation." *Littlejohn*, 795 F.3d, at 311.

With respect to the fourth prong of the *prima facie* case—whether termination occurred under circumstances giving rise to an inference of discrimination on the basis of the employee's membership in the protected class—courts have recognized that inference of discrimination "is a flexible standard that can be satisfied differently in differing factual scenarios." *Vives v. New York City Dep't of Corrections*, No. 15-CV-6127 (MKB), 2019 WL 1386738, at *11 (E.D.N.Y. Mar. 27, 2019) (internal quotation marks and brackets omitted) (quoting *Saji v. Nassau Univ. Med. Ctr.*, 724 F. App'x 11, 17 (2d Cir. 2018)). Circumstantial evidence that can give rise to an inference of discriminatory intent may include "the employer's criticism of the plaintiff's performance in ethnically degrading terms; or its invidious comments about others in the employee's protected group; or the more favorable treatment of employees not in the protected group; or the sequence of events leading to the plaintiff's discharge." *Littlejohn*, 795 F.3d at 312.

> [A]bsent direct evidence of discrimination, what must be plausibly supported by
> facts alleged in the complaint is that the plaintiff is a member of a protected class,

was qualified, suffered an adverse employment action, and has at least minimal support for the proposition that the employer was motivated by discriminatory intent.

*Id.* at 311; *see also Vega*, 801 F.3d at 87 ("At the pleadings stage, then, a plaintiff must allege that the employer took adverse action against her at least in part for a discriminatory reason, and she may do so by alleging facts that directly show discrimination or facts that indirectly show discrimination by giving rise to a plausible inference of discrimination.").

## III.    Title VII Retaliation Claim

To survive a motion to dismiss on a retaliation claim, a plaintiff must allege facts that show "(1) participation in a protected activity; (2) that the defendant knew of the protected activity; (3) an adverse employment action; and (4) a causal connection between the protected activity and the adverse employment action." *Littlejohn*, 795 F.3d at 315–16.  As with discrimination claims, "the allegations in the complaint need only give plausible support to the reduced *prima facie* requirements." *Id.* at 316.

An employee's action qualifies as a protected activity for Title VII purposes if it is an "action taken to protest or oppose statutorily prohibited discrimination," *Cruz v. Coach Stores, Inc.*, 202 F.3d 560, 566 (2d Cir. 2000), *superseded on other grounds by* N.Y.C. Local L. No. 85, and can encompass oral and informal complaints of discrimination, *see Bowen-Hooks v. City of New York*, 13 F. Supp. 3d 179, 221 (E.D.N.Y. 2014).  To plead a causal connection, "the plaintiff must plausibly allege that the retaliation was a 'but-for' cause of the employer's adverse action . . . [*i.e.*,] the adverse action would not have occurred in the absence of the retaliatory motive." *Duplan v. City of New York*, 888 F.3d 612, 625 (2d Cir. 2018).  A causal connection in retaliation claims can be shown either "(1) indirectly, by showing that the protected activity was followed closely by discriminatory treatment, or through other circumstantial evidence such as disparate treatment of fellow employees who engaged in similar conduct; or (2) directly, through evidence of retaliatory

animus directed against the plaintiff by the defendant." *Gordon v. New York City Bd. of Educ.*, 232 F.3d 111, 117 (2d Cir. 2000).

## IV.   Title VII Hostile Work Environment Claim

To establish a hostile work environment claim under Title VII, "a plaintiff must show that 'the workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment.'"  *Littlejohn*, 795 F.3d at 320–21 (quoting *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993)).   A plaintiff must ultimately prove not only that the workplace environment is objectively and subjectively hostile or abusive, but also that an employer's conduct has created such an environment "because of plaintiff's sex," or other protected characteristic. *Brown v. Henderson*, 257 F.3d 246, 252 (2d Cir. 2001).   "The incidents complained of must be more than episodic; they must be sufficiently continuous and concerted in order to be deemed pervasive." *Raspardo v. Carlone*, 770 F.3d 97, 114 (2d Cir. 2014).   When evaluating conduct that allegedly created a hostile work environment, courts will look to factors such as frequency and severity of the conduct, "whether [the conduct in question] is physically threatening or humiliating, . . . and whether it unreasonably interferes with an employee's work performance" under the totality of the circumstances. *Littlejohn*, 795 F.3d at 321.

### DISCUSSION

Plaintiff's NYSHRL and NYCHRL claims having been withdrawn (*see* Dkt. 16; *see* Pl.'s Opp., Dkt. 26, at 1 n.1)[11], the Court considers only Plaintiff's Title VII claims, which she asserts

---

[11] Although Plaintiff states that she is withdrawing her claims under NYSHRL, she puzzlingly continues to recite in her opposition brief the legal standards for asserting claims under NYSHRL.  (*See* Pl.'s Opp., Dkt. 26, at 15 (explaining that NYSHRL "mirrors the federal law" and then stating the standard for asserting a discrimination claim under NYSHRL); *id.* at 25 ("Plaintiff's hostile work environment claims should survive, especially under the N.Y.S.H.R.L.")).  Even if she were still maintaining her state law claims, they would be barred in

in her first and second causes of action: (1) that Defendant has discriminated against Plaintiff on account of her race, gender, and national origin, and retaliated against her; and (2) that Defendant subjected her to a hostile work environment on account of her race, gender, and national origin. (*See* Am. Compl., Dkt. 13, ¶¶ 109–14.)

Drawing all reasonable inferences in favor of Plaintiff, the Court finds that Plaintiff has properly pled claims of discrimination and retaliation under Title VII, but has failed to sufficiently plead a hostile work environment claim under Title VII. Therefore, Defendant's motion to dismiss is granted in part and denied in part.

## I.   Plaintiff's *prima facie* case for Title VII discrimination claim

Plaintiff alleges that Defendant violated Title VII by discriminating against her on the basis of her race, gender, and national origin. (*See* Am. Compl., Dkt. 13, ¶¶ 1, 6, 109–10.) The Court discerns two categories of alleged adverse employment actions: (1) the denial of tenure in November 2018 and subsequent termination in January 2019, and (2) assigning Plaintiff an unfavorable teaching schedule and a heavier workload, between January 2017 and the end of 2018.[12]

---

this court because the Second Circuit has held that CUNY is an "arm of the state" for the purposes of state sovereign immunity. *See Clissuras v. City Univ. of New York*, 359 F.3d 79, 83 (2d Cir. 2004) (per curiam) ("Plaintiffs' suits against CUNY are equivalent to suits against the State of New York and are therefore barred by the Eleventh Amendment."). Therefore, "absent an express waiver of sovereign immunity or a clear abrogation of that immunity by Congress, the Eleventh Amendment generally bars" suits against CUNY for claims under state law "in federal court for legal and equitable relief." *De Figueroa v. New York*, 403 F. Supp. 3d 133, 150 (E.D.N.Y. 2019) (citing *Davis v. Proud*, 2 F. Supp. 3d 460, 476–77 (E.D.N.Y. 2014)).

[12] Plaintiff also alleges that her tenure files went missing temporarily. (Am. Compl., Dkt. 13, ¶¶ 67, 69, 70.) It is unclear whether Plaintiff is claiming that the missing files constituted a separate adverse action, or whether she is asserting that the fact that the files went missing is evidence of discriminatory or retaliatory animus for a different adverse action. In either scenario, the Court finds this incident to be irrelevant to Plaintiff's claims because the files were ultimately

### A.      National-Origin Discrimination Claim

At the outset, the Court finds Plaintiff's claims that she was discriminated against based on her national origin to be plainly inadequate for meeting the *Twombly* plausibility standard.[13]  The Amended Complaint contains only a single allegation that could possibly be interpreted as discrimination against Plaintiff on account of her status as a natural-born U.S. citizen: Plaintiff asserts "[u]pon information and belief," that the College "had never hired any natural-born American citizen . . . in the C.I.S. [Department] in a full-time faculty position."  (Am. Compl., Dkt. 13, ¶ 104.)  While plaintiffs can plead facts "upon information and belief where the facts are peculiarly within the possession and control of the defendant," it is well established that "such allegations must be accompanied by a statement of facts upon which the belief is founded."  *See Barrett*, 39 F. Supp. 3d at 432 (internal brackets omitted) (quoting *JBC Holdings NY, LLC v. Pakter*, 931 F. Supp. 2d 514, 527 (S.D.N.Y. 2013)); *see also Prince v. Madison Square Garden*, 427 F. Supp. 2d 372, 385 (S.D.N.Y. 2006) ("However, allegations pled on 'information and belief' are proper if 'accompanied by a statement of the facts upon which the belief is founded.'").  Here, Plaintiff provides no such factual basis for her "information and belief" pleading.

The more fundamental flaw in Plaintiff's national-origin discrimination claim is that the statistic that zero natural-born Americans had been granted tenure in the College's C.I.S. Department, even if accurate, is insufficient without any other evidence to establish discriminatory intent as to Defendant's alleged actions against Plaintiff, who is asserting an individual disparate

---

located, and Plaintiff has not alleged any strong indicia of discriminatory and/or retaliatory animus related to these missing files.

[13] In its briefing, Defendant does not address Plaintiff's national origin discrimination claim.  (*See generally* Def.'s Mem., Dkt. 24.)  Regardless, the Court finds that Plaintiff is unable to meet even the minimal burden required to survive a motion to dismiss as to that claim.

treatment claim.  *See Drake v. Delta Air Lines*, No. 94-CV-5944 (FB), 2005 WL 1743816, at *6 (E.D.N.Y. July 21, 2005) (noting that in an individual disparate treatment claim, "[s]tatistics alone are insufficient . . . because an individual plaintiff must prove that he or she in particular has been discriminated against"); *Zenni v. Hard Rock Cafe Int'l, Inc.*, 903 F. Supp. 644, 654 (S.D.N.Y. 1995) ("[S]tatistical evidence of an employer's general hiring practices is insufficient to prove that a particular plaintiff was discriminated against."); *see also Bussey v. Phillips*, 419 F. Supp. 2d 569, 583 (S.D.N.Y. 2006) (collecting cases).  Therefore, Plaintiff's bare allegation of discrimination based on her status as a "natural-born American citizen with generational ancestry in the United States," (*see* Am. Compl., Dkt. 13, ¶ 110), is clearly insufficient to survive a motion to dismiss.

## B.   Racial and Gender Discrimination Claims

### 1.   Denial of Tenure and Termination

Plaintiff claims that Defendant's decision to deny her tenure and terminate her employment was "based on [her] being a black female."  (Am. Compl., Dkt. 13, ¶ 110.)  Defendant does not dispute that Plaintiff is a member of a protected class (Black and female), or that the denial of tenure and subsequent termination were adverse employments actions.  (*See* Def.'s Mem., Dkt. 24, at 8–13.)  However, Defendant contests whether Plaintiff was qualified for tenure, and further argues that Plaintiff "does not allege, even in conclusory terms," that those responsible for the adverse employment actions acted out of discriminatory "motives, let alone allege any facts giving even minimal support for such an inference."  (*See* Def.'s Mem., Dkt. 24, at 11; *see also* Def.'s Rep., Dkt. 27, at 5.)

Courts in the Second Circuit have long recognized that tenure decisions in the university context involve a combination of factors which tend to set them apart from other employment decisions.  *See Feinson v. New School for Social Research*, No. 95-CV-763 (MBM) (THK), 1997 WL 742532, at *9 (S.D.N.Y. 1997) (citing *Zahorik v. Cornell Univ.*, 729 F.2d 85, 92 (2d Cir.

1984)).  For example, "tenure candidates are [generally] not competing with, nor compared to, other tenure candidates," but rather "evaluated based on their own merit and on the institution's needs," and tenure decisions are "usually not made by one accountable decision-maker," but by "a committee of departmental faculty members."  *Id.*  Furthermore, because courts "cannot hope to master the academic field sufficiently to review the merits of such views and resolve the differences of scholarly opinion," *see Zahorik,* 729 F.2d at 93, courts are reluctant to review the merits of tenure decisions, *see* Feinson, 1997 WL 742532, at *9 (collecting cases).

In light of these difficulties reviewing tenure decisions, the Second Circuit has set forth additional guidance for establishing a *prima facie* case involving these decisions.  *See Zahorik*, 729 F.3d at 92–93; *see also Hall v. North Bellmore School Dist.*, 55 F. Supp. 3d 286, 296 n.12 (E.D.N.Y. 2014) (acknowledging that *Zahorik* set a "higher standard" for plaintiffs to establish a *prima facie* case for employment discrimination).  A plaintiff challenging a denial of tenure as discriminatory may establish his or her *prima facie* case of discrimination "by evidence that the plaintiff was a member of the protected group, was qualified for tenure, and was not granted tenure in circumstances permitting an inference of discrimination."  *Zahorik*, 729 F.2d at 92.  A candidate's qualifications for tenure can be established by "showing that some significant portion of the departmental faculty, referrants or other scholars in the particular field hold a favorable view on the question."  *Id.*  Furthermore, "[d]epartures from procedural regularity, such as a failure to collect all available evidence, can raise a question as to the good faith of the process where the departure may reasonably affect the [tenure] decision."  *Id.* at 93.

Applying the guidance from *Zahorik* and drawing all reasonable inferences in Plaintiff's favor, the Court finds that the facts alleged in the Amended Complaint are sufficient to establish a *prima facie* case of racial and gender discrimination with respect to Defendants' denial of tenure

to Plaintiff.  First, Plaintiff has established a *prima facie* case that she was qualified for tenure. Plaintiff alleges that the College's Personnel & Budget Committee recommended her for tenure, and that she received the highest evaluation of "outstanding" for all of the nine areas in which CUNY evaluates candidates for tenure.  (Am. Compl., Dkt. 13, ¶¶ 71, 73, 74–77.)  Plaintiff further alleges that she received "an outstanding recommendation for tenure" from the "Chairman" of her department.  (Am. Compl., Dkt. 13, ¶¶ 68.)  Because Plaintiff has alleged a "significant portion of the departmental faculty [or] referrants" held a favorable view on whether she should receive tenure, the Court finds that she has sufficiently alleged she was qualified for the position.  *See Zahorik*, 729 F.2d at 93–4.

Plaintiff's allegations are weaker for the last prong of the *prima facie* case: establishing that the circumstances of her tenure denial permit an inference of discrimination.  Plaintiff alleges that in denying her tenure in November 2018, "Defendant[] violated several of [its own] policies and guidelines for tenure" by refusing to acknowledge the favorable vote by the Personnel & Budget Committee and failing to recognize Plaintiff's doctoral degree equivalencies.  (Am. Compl., Dkt. 13, ¶¶ 86–89.)  Certainly, Plaintiff's *prima facie* case for discrimination would be stronger if she could establish that there were "[d]epartures from procedural regularity" in the tenure review process.  *See Zahorik*, 729 F.2d at 93.  However, based on the record currently before it,[14] the Court cannot find that Defendant's denial of Plaintiff's application for tenure constituted a procedural departure.

---

[14] To determine that Defendant's denial of Plaintiff's tenure application in November 2018 was a departure from its tenure procedures, the Court would need to first determine what those normal procedures were, presumably by examining CUNY's bylaws and its collective bargaining agreement with the Professional Staff Congress.  (*See* Settlement, Dkt. 23-1, Ex. A, ¶ 3 (explaining that the terms by which Plaintiff could reapply for tenure were consistent with "section 10.1(a)(2) of the collective bargaining agreement between the Professional Staff Congress" and CUNY).) Because neither party has submitted copies of CUNY's bylaws or relevant collective bargaining

The Amended Complaint also identifies six non-African American, male members of the department that Plaintiff claims were not subjected to the discriminatory and retaliatory treatment experienced by her and her Black female colleagues. (*See generally id.* ¶¶ 105–106.) Plaintiff also alleges that at least two other Black female professors were wrongfully terminated and/or subject to discriminating comments/rumors. (*See* Am. Compl., Dkt. 13, ¶¶ 98, 100 (describing a Black female professor who was terminated based on defamatory rumors that a professor "had a child with a student" that were proven false and another Black female professor who was allegedly subjected to derogatory comments related to her gender and pregnancy).)[15] Plaintiff further alleges "upon information and belief" that Defendant has never appointed a female full-time faculty member in the C.I.S. Department until her arrival, and that it has never granted tenure to a Black female in that department. (*Id.* ¶¶ 103–04.) Finally, Plaintiff alleges at least one instance of alleged discrimination in which her share of prize money for a competition that Plaintiff "was instrumental" in helping her department win was redirected to similarly situated male professors (neither Black). (*Id.* ¶ 57.)

Courts in this circuit have held that a plaintiff's allegations regarding poor treatment of other employees in the same protected class "may be highly relevant to an individual disparate treatment [claim] or to a disparate impact claim." *Lewis*, 246 F. Supp. 3d at 989 (quoting *Chin v. Port Auth. of N.Y. & N.J.*, 685 F.3d 135, 150 (2d Cir. 2012)); *see also Lieberman v. Gant*, 630 F.2d

---

agreement provisions as exhibits to their briefing, nor has any party asked the Court to take judicial notice of these documents, the Court declines to make a finding at this time as to what CUNY's normal tenure procedures were and whether the parties opted out of them by entering into the Settlement.

[15] Plaintiff mentions a third individual who "was an outstanding dean" at CUNY "only to be terminated and replaced by a male dean." (Am. Compl., Dkt. 13, ¶ 99.) It is unclear, however, whether this dean was also a professor who was up for tenure, or instead whether this colleague had a purely administrative role.

60, 68 (2d Cir. 1980) ("Evidence of general patterns of discrimination by an employer is relevant even in an individual disparate treatment case.").  In this case, based on Plaintiff's allegations of Defendant's discriminatory treatment of her relative to the other non-tenured professors (both related to and separate from the tenure process) and the allegations of poor treatment of other Black female colleagues, the Court finds that Plaintiff has alleged sufficient facts for "at least minimal support" that Defendant acted with discriminatory intent based on race and gender.  *See Littlejohn*, 795 F.3d at 311.

### 2.    Heavy Workload

Plaintiff further alleges that Defendant discriminated against her between 2017 and 2018 by "overloading her . . . work assignments so that she would be prevented from [] attending" a course that was required for her Ed.D program at Columbia University.  (Am. Compl., Dkt. 13, ¶ 41.)  An employer assigning a "disproportionately heavy workload could perhaps be an adverse action, if the additional work significantly changed the employee's responsibilities so as to diminish that worker's role or status."  *Young v. Rogers & Wells LLP*, No. 00-CV-8019 (GEL), 2002 WL 31496205, at *5 (S.D.N.Y. Nov. 6, 2002).

Plaintiff describes the additional responsibilities as "helping faculty members author publications and write grants between 9:00 am and 9:00 pm on and off-campus."  (Am. Compl., Dkt. 13, ¶ 48.)  She also lists fourteen different "overtime activities" that Defendant assigned to Plaintiff, but "not to male non-African American [c]ounterparts."  (*Id.* ¶ 80.)  Yet, the Amended Complaint contains no facts about how any of these assignments "significantly changed [Plaintiff's] responsibilities so as to diminish [Plaintiff's] role or status."  *See Young*, 2022 WL 31496205, at *5.  Plaintiff claims that these work assignments prevented her from attending the required doctoral course, but she fails to explain how these additional assignments contributed to

her inability to attend that course. Therefore, Plaintiff has not made a *prima facie* case that the heavy workload was an adverse action for the Title VII discrimination claim.[16]

       3.    Scheduling Issues

Scheduling conflicts are generally not adverse employment actions for purposes of a discrimination claim. *See Arroyo-Horne v. City of New York*, No. 16-CV-3857 (MKB), 2018 WL 4259866, at *11 (E.D.N.Y. Sept. 5, 2018); *see also Kelly v. New York State Office of Mental Health*, 200 F. Supp. 3d 378, 406 (E.D.N.Y. 2016) (explaining that a failure to provide an accommodation related to scheduling is generally "not in and of itself an adverse employment action") (internal quotation marks and citations omitted). Courts have recognized an exception to this general rule when the scheduling issues "constitute[] a setback to [a plaintiff's] career." *Seale v. Madison Cnty.*, 929 F. Supp. 2d 51, 75 (N.D.N.Y. 2013) (citing *Adams v. City of New York*, 837 F. Supp. 2d 108, 120 (E.D.N.Y. 2011)).

Here, Plaintiff alleges that her teaching schedule for the Spring 2017 semester created a "schedule conflict with the required course for the doctoral" program that she needed to complete her Ed.D degree at Columbia University. (*See* Am. Compl., Dkt. 13, ¶ 42.) For the Fall 2017 semester, Plaintiff was again unable to attend the required doctoral course, which was scheduled for Thursday evenings, because Defendant gave her a schedule that required her to teach a class on "Thursdays [from] 6:20 pm – 7:45 pm." (*Id.* ¶ 50, 53.) The same scheduling conflict with Plaintiff's required course occurred again the next semester. (*Id.* ¶ 58.) Because Plaintiff draws a link between these scheduling conflicts and her failure to meet those target goals and her

---

[16] The Court notes that should Plaintiff develop additional evidence demonstrating a connection between her allegedly increased workload and being unable to complete her doctoral course work, she can seek to amend her complaint to re-allege this aspect of her discrimination claim.

subsequent termination, she has plausibly alleged suffering a career setback. *See Seale*, 929 F. Supp. 2d at 75.

Next, the Court turns to whether the circumstances with respect to the scheduling conflicts give rise to an inference of discrimination. *See Littlejohn*, 795 F.3d at 313. Plaintiff states that Defendant discriminated against her by giving her a teaching "schedule full of conflicts" that was "very complicated" compared to the schedules Defendant set for her "male counterparts who were not African American." (Am. Compl., Dkt. 13, ¶ 44; *see also id.* ¶¶ 41–42, 50, 52–54, 84.) Plaintiff identifies three such similarly situated counterparts: Leonid Knizhik, David Ahn, and Gennady Lomako. (*Id.* ¶ 44.) In one concrete example, Plaintiff states that she was "repeatedly scheduled to work late evenings" at a satellite campus of the College, unlike at least two of those three colleagues. (Am. Compl., Dkt. 13, ¶ 84.)

The Court finds that Plaintiff's allegations regarding scheduling conflicts are sufficient to meet the plausibility standard for Rule 12(b)(6). First, Plaintiff identified the alleged comparators by name, which courts have considered to be key information for surviving a motion to dismiss. *See Barrett*, 39 F. Supp. 3d at 432 (finding that a complaint survives a motion to dismiss where plaintiff "identifies at least one male comparator" by name and "alleges that the comparator received a higher base salary"); *see also Goodine v. Suffolk Cnty. Water Auth.*, No. 14-CV-4514 (JS) (ARL), 2017 WL 1232504, at *4 (E.D.N.Y. Mar. 31, 2017) ("[P]laintiff must still identify at least one comparator to support a minimal inference of discrimination; otherwise the motion to dismiss stage would be too easy to bypass."). In fact, Plaintiff names not just one, but three, comparators who supposedly received better schedules.

Plaintiff also alleges that the schedule she received in or around January 2017 was "full of conflicts and very complicated" when compared to the schedules of the three colleagues she

identified, and specifically alleged that she was "repeatedly scheduled to work late evenings" at one of the College's satellite campuses.  (Am. Compl., Dkt. 13, ¶¶ 44, 53–54, 84.)[17]  Defendant argues that Plaintiff's allegations are "bereft of any details concerning" what Plaintiff's colleagues' "schedules were, whether they had non-employment-related issues, like [P]laintiff, that they wanted accommodated, and whether they got such accommodations." (*See* Def.'s Mem., Dkt. 24, at 13).  However, the level of specificity in the allegations demanded by Defendant is well beyond what is needed to survive a motion to dismiss.[18]  *See Barrett*, 39 F. Supp. 3d at 434 (applying Second Circuit precedent on application of *Twombly/Iqbal* in Title VII discrimination cases and finding that allegations about a Plaintiff's base salary, identifying one male comparator, and alleging that the comparator received a higher base salary is sufficient to survive 12(b)(6) motion). Especially given the Second Circuit's recent emphasis that a complaint need only allege "facts supporting a minimal[ly] plausible inference of discriminatory intent," *see Doe*, 831 F.3d at 55,

---

[17] Defendant states that this "scheduling complaint, involving scheduling of night work, is not alleged to have interfered with her classwork." (*See* Def.'s Mem., Dkt. 24, at 4 n.5 (referring to paragraph 84 of the Amended Complaint).)  The Court disagrees.  Plaintiff has alleged that she needed to attend a required course for her program on Thursday evenings, and in paragraph 84 of the Amended Complaint, she claims she "was repeatedly scheduled" to work late evenings in a satellite campus.  Defendant may have been confused because Plaintiff adds parenthetically that this satellite campus was "located in a high crime neighborhood."  Although the Court finds this detail gratuitous and irrelevant to Plaintiff's claims, it does not detract from the primary point of this paragraph: Plaintiff once again was scheduled to work evenings, presumably including Thursday evening, which interfered with her ability to attend her required course.

[18] Defendant claims, incorrectly, that Plaintiff's Amended Complaint does not list the positions of her supposed comparators and whether they have tenure. (*See* Def.'s Mem., Dkt. 24, at 13).  However, Plaintiff has included that information in her allegations. (*See* Am. Compl., Dkt. 13, at ¶¶ 105(c), (e), (f) (listing positions and tenure status of the three comparators identified by Plaintiff).  Defendant also mischaracterizes Plaintiff's scheduling issues as a "non-employment related issue" (Def.'s Mem., Dkt. 24, at 13), conveniently ignoring that Plaintiff needed to complete the degree program per the terms of her Settlement with Defendant.

the Court finds that Plaintiff's discrimination claim on the basis of the denial of tenure survives Rule 12(b)(6).

### C. Defendant's arguments against the Title VII discrimination claim are unavailing

Defendant raises several defenses against the discrimination claim, none of which are convincing.  First, Defendant argues that this Court should find that "there is an inference *against* discrimination" because President Crew, like Plaintiff, is Black.  (*See* Def.'s Mem., at 11 (emphasis in original).)  Defendant cites to *Milord-Francois v. New York State Off. of Medicaid Inspector General*, for this proposition, but Defendant appears to misinterpret that decision.  *See Milord-Francois*, No. 19-CV-179 (LJL), 2020 WL 5659438, at *11 (S.D.N.Y. Sept. 23, 2020), *reversed and vacated in part on other grounds*, 2022 WL 480477 (2d. Cir. Feb. 17, 2022).  First, Defendant is incorrect to suggest that the *Milord-Francois* elevates the protected class of the decisionmaker as some superseding factor that creates an inference *against* discrimination, despite all evidence to the contrary.  In *Milord-Francois*, although the decisionmaker involved in the plaintiff's demotion was a Black woman like the plaintiff, the court's primary reason for granting summary judgment in favor of the defendants was that the plaintiff "d[id] not identify any evidence" that the decisionmaker "harbored any animus against [the plaintiff] on the grounds of race, ethnicity, or national origin."  *Id.* at *11 (citing *Eder v. City of New York*, No. 06-CV-13013 (RWS), 2009 WL 362706, at *8 (S.D.N.Y. Feb. 12, 2009)).  Similarly, in *Eder v. City of New York*, the court merely held that where the decisionmaker and the plaintiff "are members of the same protected class . . . any inference of discrimination, without additional evidence, is not warranted."  *Eder*, 2009 WL 362706, at *8.  Plainly, neither *Milord-Francois* or *Eder* stand for the proposition that where the plaintiff and decisionmaker are in the same protected class, there can never be discrimination; rather, there must be "additional evidence" of discrimination.  Here,

Plaintiff alleges such additional evidence of discrimination.  Therefore, even applying *Milord-Francois* and *Eder*, cases which this Court has no obligation to follow, an inference of discrimination is allowed, even though President Crew is a Black man.[19]

Defendant next argues that President Crew's decision to deny tenure should receive the "same actor" inference because he "himself authorized the very Settlement Agreement that extended [P]laintiff's employment and set the terms and conditions for tenure." (Def.'s Mem., Dkt. 24, at 11.) Again, Defendant is mistaken. It is true that the Second Circuit held in *Grady v. Affiliated Cent., Inc.*, that when a person who made the initial decision to hire an employee later fires that same employee, it would be "difficult to impute to [the decisionmaker] an invidious motivation that would be inconsistent with the [hiring] decision." *See* 130 F.3d 553, 560 (2d Cir. 1997). However, this "same actor" principle has far less applicability in circumstances where the decisionmaker who first hired the employee had "collateral incentive to hire [a] particular candidate." *Jetter v. Knothe Corp.*, 324 F.3d 73, 76 (2d Cir. 2003) (declining to apply "same actor" principle from *Grady* where the decisionmaker's "collateral incentive" to hire plaintiff was to acquire plaintiff's company). Here, the "collateral incentive" of President Crew's decision to offer the Settlement is clear: Plaintiff agreed to release all previous discrimination and retaliation claims against Defendant. (*See* Am. Compl., Dkt. 13, ¶ 39.)

Finally, Defendant dedicates a significant portion of its motion briefing to drawing this Court's attention to statements that Plaintiff made under oath in bankruptcy proceedings that

---

[19] Of course, Defendant's argument also glosses over the fact that Plaintiff is a Black *woman* who is bringing race and gender discrimination claims based on the decision of a Black *man* to deny her tenure. Even if the Court were to infer that President Crew's decision was not racially discriminatory based on Defendant's incorrect reading of *Milord-Francois*, there would be no impact on Plaintiff's claim that the denial of tenure was discriminatory based on her gender.

purportedly contradict what she has asserted in her Amended Complaint.  (*See* Def.'s Mem., Dkt. 24, at 2, 5–8; Def.'s Rep., Dkt. 27, at 3–4.)  In her bankruptcy proceedings, Plaintiff testified to the following

> Plaintiff-Debtor denies Trustee's Argument paragraph A.25, as she has already provided the court with proof that the obtaining a doctoral degree is required for her employment in the adversary proceeding (Exhibit 23).  It is general knowledge that if a faculty member does not receive tenure, they are terminated.  *Plaintiff-Debtor's employer was considerate and patient while she struggled with Columbia University for her degree.*  No other colleges hire faculty in full-time positions unless they can complete the dissertation in the first semester hired.  The Plaintiff-Debtor needs the doctoral degree as a condition of her employment.

(Pl.'s Opp., Dkt. 26, at 12 (emphasis added).)

When considering a motion to dismiss, courts can take "judicial notice of trial transcripts from an associated case not for the truth of the matter asserted in the transcripts, but rather to establish the fact of litigation, filings, or 'to determine what the respective parties said.'"  *Charles v. Cnty. of Nassau*, 116 F. Supp. 3d 107, 124 n.21 (E.D.N.Y. 2015) (citing *Coggins v. Cnty. of Nassau*, 988 F. Supp. 2d 231, 242 (E.D.N.Y. 2013)).  Thus, if Defendant is correct that Plaintiff's statements in her bankruptcy pleadings contradict the Amended Complaint, the Court would have to accept Plaintiff's sworn testimony over the allegations in her complaint.  *See Luck v. Westchester Med. Ctr.,* No. 17-CV-9110 (NSR), 2019 WL 416333, at *5 (S.D.N.Y. Feb. 1, 2019); *see also Thomas v. Westchester Cnty. Health Care Corp.*, 232 F. Supp.2d 273, 279 (S.D.N.Y. 2002) ("Faced with [a] confounding contradiction [between plaintiff's allegations in her complaint and her sworn testimony], the Court has no basis for accepting as true the vague statements in [the] [c]omplaint as opposed to [plaintiff's] sworn testimony. . . .").

However, the Court finds that Plaintiff's statements in the bankruptcy proceedings are not contradictory to her claims in this case because it is unclear what behavior Plaintiff was referring

to when she claimed that CUNY was "considerate and patient" while she was attempting to obtain her doctoral degree.  (Pl.'s Opp., Dkt. 26, at 12.)  Defendant apparently reads this statement as Plaintiff stating in sworn testimony that CUNY was "considerate and patient" with Plaintiff during the entire period between when she was reinstated after she signed the Settlement until she was denied tenure again in November 2018, in which case this statement would appear to contradict the allegations in this case.

However, an alternative interpretation of this statement is that Plaintiff considered Defendant to be "considerate and patient" in extending her tenure eligibility period as part of the Settlement.  In that case, Defendant could nevertheless have engaged in discriminatory and retaliatory behavior towards Plaintiff both before and after the Settlement, despite having granted her this opportunity to work toward tenure pursuant to the Settlement.  Because district courts have an obligation in considering motions to dismiss to "construe all reasonable inferences that can be drawn from the complaint in the light most favorable to the plaintiff," *Arar*, 585 F.3d at 567, the Court will not leap to the conclusion that Plaintiff's statements are contradictory when there are multiple possible interpretations.  *See A.B. by Alverez v. United States*, No. 16-CV-2554 (LMS), 2019 WL 10302175, at *17 (S.D.N.Y. Apr. 17, 2019) ("'[A]mbiguous' testimony that leaves room for 'interpretation' is not contradictory.") (citing *Perez v. Manna 2nd Ave. LLC*, No. 15-CV-4655 (JCF), 2016 WL 7489040, at *3 (S.D.N.Y. Dec. 28, 2016)).

*       *       *

Accordingly, Defendant's motion to dismiss Plaintiff's discrimination claims on the basis of gender and race are denied, while the motion is granted as to Plaintiff's claim that she was discriminated against based on her national origin.

27

## II.    Title VII retaliation claims

Plaintiff claims that she engaged in protected activity when she complained about scheduling conflicts after signing the Settlement, and that Defendant retaliated against her by increasing her workload, continuing to give her teaching schedules that interfered with her degree program, and ultimately denying her tenure in November 2018.  (Am. Compl., Dkt. 13, ¶¶ 41, 56, 58–59, 108).[20]

In response, Defendant argues that "the only possibly retaliatory action" it took was denying Plaintiff tenure, thereby contesting whether the increased workload and conflicting schedules were adverse employment actions.  (Def.'s Rep., Dkt. 27, at 5.)  Defendant also contends that Plaintiff has failed to establish that the individuals who allegedly assigned Plaintiff's workload and schedule knew of her protected activity.  As to all of the three purported adverse employment actions (increased workload, ongoing scheduling conflicts, and denial of tenure), Defendant argues that Plaintiff has not sufficiently alleged a causal connection.

Because different tests apply for determining whether a particular employment action is adverse for a discrimination claim versus a retaliation claim, a particular employment action can be the basis of a retaliation claim, even though it is not sufficiently adverse for the purposes of a discrimination claim.  *See Ahmad v. New York City Health & Hospitals Corp.*, No. 20-CV-675 (PAE), 2021 WL 1225875, at *17 (S.D.N.Y. Mar. 31, 2021).  In fact, courts have recognized that there "is a lower standard for adverse action [for a retaliation claim] as compared to a

---

[20] Plaintiff also alleges that "CUNY discriminated and retaliated against her by pressuring her to sign" the Settlement while "intentionally put[ting] up obstacles that would interfere with Plaintiff's ability to obtain the degree."  (Am. Compl., Dkt. 13, ¶ 61.)  The Court construes this paragraph in the Amended Complaint as further factual allegations supporting the claims related to the scheduling conflicts and workload issues, and not as a separate potential adverse action for her discrimination or retaliation claims.

discrimination claim." *Carpenter v. City of Mount Vernon*, 198 F. Supp. 3d 272, 282 (S.D.N.Y. 2016).

      With respect to retaliation claims, a defendant has engaged in an adverse employment action if that action "well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Kessler v. Westchester Cnty. Dep't. of Soc. Servs.*, 461 F.3d 199, 207 (2d Cir. 2006) (quoting *Burlington Northern & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006)). A plaintiff must demonstrate the "material adversity" of the potential adverse action, because "it is important to separate significant from trivial harms." *See Kelly*, 200 F. Supp. 3d at 403 (quoting *White*, 548 U.S. at 68)). Minor grievances such as "petty slights, minor annoyances, and simple lack of good manners" do not normally constitute adverse actions for purposes of a retaliation claim. *White*, 548 U.S. at 68.

      The Court finds that Plaintiff participated in protected activity when she lodged numerous complaints about her scheduling issues. *See Rodriguez v. Town of Ramapo*, 412 F. Supp. 3d 412, 442 (S.D.N.Y. 2019) (holding that informal protests to management of discriminatory practices are protected activities (collecting cases)). Further, Defendant is incorrect in suggesting that Plaintiff needed to allege that "the actors who created the schedules [about which Plaintiff complained] were aware of any protected activity" (*see* Def.'s Mem., Dkt. 24, at 11), because the Second Circuit has clearly held that "a plaintiff may rely on 'general corporate knowledge' of her protected activity to establish the knowledge prong of the prima facie case," *see Zann Kwan v. Andalex Group LLC*, 737 F.3d 834, 844 (2d Cir. 2013) (quoting *Gordon*, 232 F.3d at 116). Because an employee's complaint to a corporate officer is imputed to the employer, Defendant CUNY had general corporate knowledge of Plaintiff's protected activity when she complained in

May 2018 to the College's President and Provost. *See id.* at 844–45.[21]  Furthermore, the Court

finds that because Plaintiff had previously complained numerous times about discrimination and

retaliation, and even initiated an arbitration proceeding against Defendant related to those claims,

it is safe to assume that her complaints to various supervisors between the time she signed the

settlement and when she was terminated for the second time were escalated, and Defendant as an

entity had knowledge of these complaints.

Accordingly, Plaintiff has satisfied the first two prongs of her retaliation claim, and needs

only to prove the latter two: that there was an adverse employment action and a causal connection

between the protected activity and the adverse employment action.  *See Littlejohn*, 795 F.3d at

315–16.  The Court examines in turn whether Plaintiff has satisfied these two prongs for each of

the three potential adverse employment actions: increasing her workload, assigning teaching

schedules that interfered with her degree program, and denying her tenure for the second time.[22]

---

[21] Plaintiff alleges that she complained about her scheduling conflicts (if not other perceived grievances) on the following occasions: on January 26, 2017 to an unidentified individual about her teaching schedule (Am. Compl., Dkt. 13, ¶ 42); multiple more times from January 26, 2017 to February 2, 2017 to Tanya Isaacs (*id.* ¶ 43); sometime around August 2017 to the Department Chairman Randy Robotham (*id.* ¶ 53); on "a continuous basis" in 2017 and 2018 to the College Provost and the Dean (*id.* ¶¶ 56, 85); sometime after receiving her schedule in January 2018 for the next semester to an unspecified individual (*id.* ¶ 58); in May 2018 to the College's President and Provost (*id.* ¶ 60); at unspecified periods to Dean Joan Rolle (*id.* ¶ 60); again to the College Provost in September 2018 (*id.* ¶ 65); and to the Department Chairman once again sometime in 2018 (*id.* ¶ 85).  Positions such as provost or president of a university are "corporate officers" of the institution.  *See Cole v. Univ. of Hartford*, 391 F. Supp. 888, 892 (D. Conn. 1975)*; see also Bagley v. Yale University*, No. 13-CV-1890 (CSH), 2015 WL 1724115, at *2 (D. Conn. Apr. 15, 2015) (acknowledging in a pre-trial discovery context that the then-President and previous Provost of a university was analogous to a corporate officer of a private company). The Court, however, recognizes that it is likely that complaints to Isaacs (who seems to have had a union-designated position) would likely not be imputed to Defendant, and that it is less clear whether Robotham (a department chair) and Jolle (a dean) would be considered "corporate officers" for purposes of imputing knowledge to the Defendant under *Zann Kwan*.

[22] The Second Circuit has explained that district courts that are weighing whether certain action amounts to an adverse employment action "need to [] consider[] both separately and in the aggregate [whether such] minor acts of retaliation can be sufficiently substantial in gross to be

### A.  Additional Work Assignments

Plaintiff's bare and conclusory allegations related to the additional work assignments she received are insufficient to show that there was an adverse employment action.  Courts have recognized that additional work assignments generally do not constitute adverse actions for purposes of a retaliation claim.  *Kelly*, 200 F. Supp. 3d at 406 (citing *Mutts v. S. Conn. State. Univ.*, 242 F. App'x 725, 727 (2d Cir. 2007)).  Plaintiff provides a long list of additional work that she was assigned, but she does not allege that her workload was materially disproportionate to similarly situated colleagues in her department.  *See Delgado v. Triborough Bridge & Tunnel Auth.*, 485 F. Supp. 2d 453, 461 (S.D.N.Y. 2007) ("While an increased workload is considered only a mere alteration of job responsibilities, a workload heavily disproportionate to those similarly situated has been held to be an example of an adverse action." (citing *Feingold v. New York*, 366 F.3d 138, 153 (2d Cir. 2004))).  Even drawing reasonable inferences in her favor, the Court finds that the additional work assignments she received are the type of "minor annoyances" that do not constitute adverse employment actions in retaliation claims.  *See White*, 548 U.S. at 68.

Even if these additional work assignments could be considered adverse employment actions, Plaintiff has also failed to show a causal connection to the protected activities, as she provides very little information on when Defendant directed her to complete these additional assignments.  In fact, the few temporal indicators that she included make clear that it would be impossible for some of these "overtime" obligations to have been imposed in retaliation for her complaints about her treatment from 2017 onward.  For example, Plaintiff acknowledges that she

---

actionable." *Hicks v. Baines*, 593 F.3d 159, 165 (2d Cir. 2010) (internal quotation marks omitted).  As further explained below, the Court has found that at least two of the three potential adverse actions raised by Plaintiff are sufficiently adverse for the retaliation claim to survive, and thus, the question of whether these actions are in aggregate sufficient to state a *prima facie* case for retaliation is moot.

was tasked with "Creating a Faculty Training Institute" in 2013.  (Am. Compl., Dkt. 13, ¶ 80.) She also identifies working as deputy chair of the C.I.S. Department as another retaliatory action, even though Plaintiff was demoted from that position sometime before 2014.  (Am. Compl., Dkt. 13, ¶ 26–27.)  Neither of these can be retaliatory actions for protected activity that Plaintiff engaged in several years later.  As for the remaining assignments that Plaintiff claims constitute the adverse employment action for her retaliation claim, Plaintiff's bare allegations provide no details as to when she received these assignments, and the Court therefore cannot find that she has met even the minimal burden to establish that a causal link with her protected activity.[23]

### B.    Scheduling Conflicts

As the Court explained above, Plaintiff has made a *prima facie* case that her scheduling conflicts in 2017 and 2018 constituted a setback to her career by interfering with her ability to attend a required course for her Ed.D program.  The Court also finds that these scheduling conflicts are adverse employment actions for the purposes of Plaintiff's retaliation claim because Defendant's alleged actions of assigning a teaching schedule that contains conflicts, semester after semester, to an employee who had complained that the teaching schedule interfered with her degree program is "harmful to the point that it could well dissuade a reasonable worker" from continuing to complain about the teaching schedule.  *See Vogel v. CA, Inc.*, 662 F. App'x 72, 76 (2d Cir. 2016) (brackets omitted).

It is a much closer call whether Plaintiff has alleged sufficient facts for the Court to plausibly infer that retaliation was the but-for cause of these scheduling issues.  First, it is important to clarify which scheduling conflicts Plaintiff is alleging were retaliatory for which protected

---

[23] As the Court previously noted, should Plaintiff develop evidence during discovery to support her retaliation claim based on an allegedly increased workload that occurred in 2017 onward, she can seek to amend her complaint to re-plead this aspect of her retaliation claim.

activities.[24]   Plaintiff alleges that she received teaching schedules that interfered with her doctoral program schedule in January 2017, August 2017, and January 2018.   She also alleges that she complained about retaliation and/or discrimination in January/February 2017, August 2017, January 2018, May 2018, and September 2018.   Favorably construing the allegations as to the scheduling conflicts, Plaintiff is claiming that (1) her August 2017 schedule was in retaliation for her complaints in January/February 2017, and (2) that her January 2018 schedule was in retaliation for her complaints in August 2017.   (*See* Am. Compl., Dkt. 13, ¶¶ 58–59.)

In both these instances, Plaintiff has alleged a temporal proximity that can support an inference of causation.   First, Plaintiff alleges that she was retaliated against in August 2017, five months after she lodged complaints about her Spring 2017 teaching schedule in January and February of 2017.   As this Court recently explained, the Second Circuit has "fastidiously avoided

---

[24] The Court would be remiss if it failed to note that the vagueness in some of Plaintiff's allegations regarding her complaints about scheduling made it particularly difficult to determine the temporal proximity between potential protected activity and the alleged adverse employment actions.   While Plaintiff claims that "[i]n 2017 and 2018, Plaintiff complained many times on a continuous basis about the discrimination and retaliation" that she experienced, Plaintiff often fails to provide even the most basic details of when, to whom, and about what she complained.   (*See* Am. Compl., Dkt. 13, ¶ 56; *see also id.* ¶ 85 (similarly vague allegations about "continuously complain[ing] to the Defendants (Dean, Provost, and Department Chair)" in 2018, without providing details).)   For example, Plaintiff alludes to complaints she made with "Dean Joan Rolle [that were] to no avail," without explaining what the subject matter of her complaint was or on what date (or even which month) this supposed protected activity occurred.   (*See id.* ¶ 60.) Similarly, when discussing the scheduling conflicts she received in January 2018, Plaintiff "again complained about discrimination and retaliation" without providing crucial details of when Plaintiff complained about this schedule and to whom.   (*See id.* ¶ 58.)   Of course, this Court cannot determine temporal proximity between the alleged retaliatory scheduling and the protected conduct (*i.e.*, complaints about previous scheduling), where Plaintiff "does not provide the date" that she lodged her previous complaints, *see Soto v. Marist Coll.*, No. 17-CV-7976 (KMK), 2019 WL 2371713, at *11 (S.D.N.Y. June 5, 2019); *see also Henry v. NYC Health & Hosp. Corp.*, 18 F. Supp. 3d 396, 412 (S.D.N.Y. 2014) (finding plaintiff failed to state a retaliation claim where complaint "fails to state with even a modicum of specificity [as to] when the relevant events occurred"), and thus has not relied on the inadequately pled incidents of retaliation in resolving this motion.

drawing a 'bright line' defining the outer limits 'beyond which a temporal relationship is too attenuated to establish causation.'" *De Figueroa v. New York State et al.*, No. 17-CV-436 (PKC) (LB), 2022 WL 4111028, at *8 (E.D.N.Y. Sept. 8, 2022) (quoting *Gorman-Bakos v. Cornell Co-op Extension of Schenectady Cnty.*, 252 F.3d 545, 554 (2d Cir. 2001)).  Even though there is no defined outer bound for temporal proximity, courts in the Second Circuit have consistently recognized that five months of temporal proximity between protected activity and an adverse employment action is sufficient to establish a *prima facie* case of retaliation.  *See Specht v. City of New York*, 15 F.4th 594, 605 (2d Cir. 2021) (holding that five months between protected conduct was "sufficient to permit an inference of causation"); *see also De Figueroa,* 2022 WL 4111028, at *8 (collecting cases).

There is more ambiguity in the case law about whether the seven-month temporal gap between Plaintiff's complaints in August 2017 and her next purportedly conflict-filled schedule being issued in January 2018 would support a finding of causation.  Some courts in this circuit have recognized that "a seven-month gap between the protected conduct and retaliatory action may be 'on its own too attenuated to give an inference of but-for causation.'"  *See Alvardo v. Mount Pleasant Cottage Sch. Dist.*, 404 F. Supp. 3d 763, 786 (S.D.N.Y. 2019) (ellipsis omitted) (quoting *Avillan v. Brennan*, No. 16-CV-5611 (AJN) (RLE), 2018 WL 4680027, at * 5 (S.D.N.Y. Sept. 28, 2018)); *but see Summa v. Hofstra Univ.*, 708 F.3d 115, 128–129 (2d Cir. 2013) ("[S]even months is within the temporal range that we have found sufficient to raise an inference of causation . . . .").

Here, the Court finds that the seven-month temporal gap is sufficient for inferring causation in light of the fact that, as Plaintiff observes, a gap of that length between protected activity and allegedly retaliatory conduct can be expected because teaching schedules for every semester are only issued every several months in accordance with the academic calendar.  (*See* Am. Compl.,

Dkt. 13, ¶ 51.)[25]   Furthermore, Plaintiff's allegation that there was a pattern of such retaliatory scheduling that spanned two years lessens the significance of the temporal gap for one of the acts within that pattern.   Therefore, the Court finds Plaintiff has met the low burden of demonstrating that the scheduling conflicts were acts of retaliation.

### C.    Denial of Tenure and Termination

Defendant concedes that the denial of tenure was an adverse employment action, but it argues that there was no causal connection because the denial of tenure took place "about one and a half years after [Plaintiff's] alleged protected activity."  (Def.'s Rep., Dkt. 27, at 5.)  According to Defendant, Plaintiff's Amended Complaint "makes no attempt to tie her complaints to the denial of tenure."  (Def.'s Mem., Dkt. 24, at 13.)

Defendant overlooks Plaintiff's allegation that she complained in May 2018—six months before her tenure denial—in writing to the Provost and President of the College, about discrimination and retaliation against her.  (Am. Compl., Dkt. 13, ¶ 60.)  Plaintiff claims that she raised concerns with the Provost again during an in-person meeting with the Provost in September 2018 about the discrimination and retaliation against her, specifically raising the "scheduling

---

[25] Admittedly, Plaintiff ultimately may be unable to prove these allegations related to the scheduling issues at trial.  However, the Court finds that since discovery is going to proceed in this matter as to the schedule conflicts alleged as part of Plaintiff's discrimination claims, the "better course" is not to dismiss the discrimination claims as to the scheduling issues at this early stage of the litigation.  *Bacchus v. New York City Bd. of Ed.*, 137 F. Supp. 3d 214, 241 (E.D.N.Y. 2015) (finding that "better course" was not to dismiss claim based on same evidence as surviving claims); *Thibodeaux v. Travco Ins. Co.*, No. 13-CV-5599 (ERK) (VVP), 2014 WL 354656, at *2 (E.D.N.Y. Jan. 31, 2014) ("If one of a number of integrally related causes of action have to be tried, it makes little sense to grant a motion to dismiss as to one or more of them, as it may prove necessary to hold yet another trial in the event that it is determined on appeal that the motion to dismiss was improperly granted.").  Of course, Defendant is free to raise this issue again at summary judgment if it concludes, following discovery, that the undisputed facts can establish that retaliation was not a but-for cause of scheduling.  But at this stage of the proceedings, the Court finds that Plaintiff's allegations of retaliation as to the scheduling conflicts are sufficient to survive a motion to dismiss.

conflicts, the long day schedules, and the overloaded work assignments unlike her male non-African American counterparts."  (Am. Compl., Dkt. 13, ¶ 65.)

These complaints were protected activities given that the subject matter of the complaints was about alleged discrimination.  *See Rodriguez*, 412 F. Supp. 3d at 442.  And certainly, the distance between the complaints in May 2018 and September 2018, and the denial of tenure in November 2018 fall well within the "few months [time period] normally accepted" by courts in this circuit "as supporting a retaliation claim."  (*See* Def.'s Mem., Dkt. 24, at 13.)  Therefore, Plaintiff has established a sufficient causal connection between her being denied tenure and her protected activity in September 2018 relating to alleged discriminatory animus and retaliation by Defendant.[26]

### III.    Plaintiff has not established a case for a hostile work environment

Finally, Plaintiff's factual allegations related to her hostile work environment claim are underdeveloped and far too conclusory to sufficiently allege a Title VII claim.  In her Amended Complaint, Plaintiff merely states that she was subject to "a hostile work environment that caused [her] several serious medical issues," without actually describing what made her work environment so hostile.  (Am. Compl., Dkt. 13, ¶ 91).  Plaintiff insists that her factual allegations "should be

---

[26] Defendant cites the Second Circuit's opinion in *Slattery v. Swiss Reins. Am. Corp.* for the principle that "where timing is the only basis for a claim of retaliation, and gradual adverse job actions began well before the plaintiff had ever engaged in protected activity, an inference of retaliation does not arise."  (*See* Def.'s Mem., Dkt. 24, at 13 (brackets omitted) (citing *Slattery*, 248 F.3d 87, 95 (2d Cir. 2001)).  Defendant's attempt to extend *Slattery* to the current context is misguided.  The Second Circuit in *Slattery* held that the alleged "adverse employment actions were both part, and the ultimate product, of 'an extensive period of progressive discipline' which began when [the defendant] diminished [the plaintiff's] job responsibilities a full *five months prior* to his filing of the EEOC charge."  248 F.3d at 95.  By contrast, here there are no allegations in the record about any disciplinary history as to Plaintiff, and so there is not "an extensive period of progressive discipline."  *See also Gordon v. Health & Hospitals Corp.*, No. 06-CV-1517 (RJD) (LB), 2008 WL 924756, at *11 n.16 (rejecting application of *Slattery* on similar grounds).

viewed in the aggregate" and that her Title VII hostile work environment claim meets the motion to dismiss hurdle because she consistently "was treated less well than other counterparts who were not African American and were not natural U.S. born citizens, on a consistent basis, in terms of discipline, schedule, tenure, back pay, etc." (Pl.'s Opp., Dkt. 26, at 25.)

The Court disagrees, and finds that Plaintiff allegations as to her hostile work environment claim fall well short of the plausibility threshold to survive a motion to dismiss. Nowhere in the Amended Complaint does Plaintiff claim that she was subjected to "discriminatory intimidation, ridicule, and insult," or other forms of "severe and pervasive" mistreatment that would create a hostile work environment. *See Petrosino v. Bell Atl.*, 385 F.3d 210, 223–24 (2d Cir. 2004). Notably, Plaintiff does not allege a single instance of being subjected to slurs, derogatory comments, harassment, or any gender or racial-stereotypes (*see generally* Am. Compl., Dkt. 13), let alone multiple occurrences of such actions that courts typically look for when determining whether a hostile work environment exists, *see, e.g.*, *Morris v. David Lerner Assocs.*, 680 F. Supp. 2d 430, 441 (E.D.N.Y. 2010) (finding that plaintiff stated a claim for hostile work environment where complaint alleges numerous occasions of sexually explicit comments and actions).

To the extent that Plaintiff is alleging that Defendant subjected her to a hostile work environment in how it set her schedule from 2017 to 2019 and by assigning her additional assignments during that same period, such grievances do not rise to the level of severity or pervasiveness to sustain a hostile work environment claim under Title VII. *See, e.g.*, *De la Cruz v. City of New York*, 783 F. Supp. 2d 622, 644 (S.D.N.Y. 2011) ("Several of the matters about which [Plaintiff] complains do not rise to the level of an actionable hostile work environment claim[] [including] . . . the changes in his work schedule . . . ."); *Harvin v. Manhattan & Bronx Surface Transit Operating Auth.*, No. 14-CV-5125 (CBA) (RER), 2016 WL 11318241, at *10

(E.D.N.Y. Mar. 3, 2016) (finding plaintiff's complaints that "she was assigned a heavy workload; denied proper trainings, resources, and assistance to perform her work; and was treated unfairly" were insufficient to establish the existence of a hostile work environment).  Confusingly, Plaintiff also references workplace discipline as part of her hostile work environment claim.  (*See* Pl.'s Opp., Dkt. 26, at 25.)  But even when viewing the factual allegations in the light most favorable to her, the Court cannot discern any part of the Amended Complaint that references Plaintiff being subject to discipline, let alone that she was disciplined more harshly than her non-Black, non-American-born colleagues.  (*See generally* Am. Compl., Dkt. 13.)

In sum, with respect to her hostile work environment claims, Plaintiff "only makes general allegations that African-American[] [women] are treated differently in the workplace" by Defendant, which are plainly insufficient to sustain a hostile work environment claim.  *See Hill v. Rayboy-Brauestein*, 467 F. Supp. 2d 336, 360 (S.D.N.Y. 2006).  Accordingly, the Court grants Defendant's motion to dismiss the Title VII hostile workplace environment claim.

## CONCLUSION

For the reasons stated above, the Court holds as follows: (1) Defendant's motion to dismiss is granted with respect to Plaintiff's Title VII hostile work environment claims; (2) Defendant's motion to dismiss is granted with respect to Plaintiff's Title VII discrimination claims on the basis of national origin; (3) Defendant's motion to dismiss is denied as to Plaintiff's Title VII discrimination claims on the basis of race and gender; (4) Defendant's motion to dismiss as to Plaintiff's Title VII retaliation claim is denied; and (5) Plaintiff's NYSHRL and NYCHRL claims are deemed to be withdrawn, or to the extent that Plaintiff did not intend to withdraw these claims, they are dismissed as barred in federal court pursuant to the Eleventh Amendment.

SO ORDERED.

*/s/ Pamela K. Chen*
Pamela K. Chen
United States District Judge

Dated: September 30, 2022
      Brooklyn, New York