UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
--------------------------------------------------------x
KIM M. BROWN,

                              Plaintiff,

            - against -

CITY UNIVERSITY OF NEW YORK,

                              Defendant.
--------------------------------------------------------x

**MEMORANDUM & ORDER**
21-CV-0854 (PKC) (MMH)

PAMELA K. CHEN, United States District Judge:

Plaintiff Kim M. Brown ("Plaintiff" or "Brown"), a former tenure-track professor at Medgar Evers College ("the College"), one of the constituent senior colleges of the City University of New York ("Defendant" or "CUNY"), asserts claims against CUNY for discrimination on the basis of race and gender, and for retaliation for reporting such discrimination, both in violation of Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. §§ 2000e *et seq.*[1]  Currently pending before the Court is Defendant's motion for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure.  For the reasons discussed below, Defendant's motion for summary judgment is granted in its entirety, and Plaintiff's remaining claims are dismissed.  The Clerk of Court is respectfully directed to enter judgment and close this case.

---

[1] Plaintiff also brought claims for national origin-based discrimination and various state and local law claims, which the Court previously dismissed.  (*See* Mem. & Order on Mot. to Dismiss, Dkt. 28.)

# BACKGROUND

## I.    Factual Background[2]

Plaintiff is a Black woman who first started working at CUNY in 1998 as an adjunct

professor in the Department of Computer and Information Systems.  (Dep. of Kim Brown ("Pl.'s

---

[2] Unless otherwise noted, a standalone citation to a party's Local Rule 56.1 statement denotes that this Court has deemed the underlying factual allegation undisputed.  Any citation to a party's Local Rule 56.1 statement incorporates by reference the documents cited therein.  Where relevant, however, the Court may cite directly to an underlying document.  But where Plaintiff either (i) admits or (ii) denies without citing to admissible evidence certain of the facts alleged in Defendants' 56.1 statement, the Court may deem any such facts undisputed.  *See* Local Rules of the United States District Courts for the Southern and Eastern Districts of New York 56.1(c)–(d); *Lumbermens Mut. Cas. Co. v. Dinow*, No. 06-CV-3881 (TCP), 2012 WL 4498827, at *2 n.2 (E.D.N.Y. Sept. 28, 2012) ("Eastern District Local Rule 56.1 requires . . . that disputed facts be *specifically* controverted by admissible evidence.  Mere denial of an opposing party's statement or denial by general reference to an exhibit or affidavit does not specifically controvert anything." (emphasis in original)); *Risco v. McHugh*, 868 F. Supp. 2d 75, 87 n.2 (S.D.N.Y. 2012).  In addition, the Court will not consider "factual assertions" contained in the 56.1 Statements "that are otherwise unsupported in the record."  *Giannullo v. City of New York*, 322 F.3d 139, 140 (2d Cir. 2003) (citation omitted).

In this case, Plaintiff's response to Defendant's 56.1 Statement largely consists of (1) admissions, and (2) denials of specific facts without citations to contravening evidence.  (*See* Pl.'s Resp. to Def.'s R. 56.1 Statement ("Pl.'s 56.1 Resp."), Dkt. 53.)  Though Local Rule 56.1(b) permits a party opposing summary judgment to submit counter-statements of material fact that "include . . . additional paragraphs containing a separate, short and concise statement of additional material facts," Plaintiff has not done so here.  (*See id.*)  Instead, in support of her arguments in opposition to Defendant's motion, Plaintiff primarily relies on her declaration, which, as Defendant explains, "is a nearly word-for-word cut-and-paste of paragraphs 9 through 108 of the Amended Complaint."  (Def.'s Reply, Dkt. 50-32, at 2; *see also id.* at 2 n.1 (explaining slight discrepancies between the Amended Complaint and Plaintiff's declaration); Decl. of Kim Brown, Dkt. 52.)  But "[t]he object of [Rule 56] is not to replace conclusory allegations of the complaint or answer with conclusory allegations of an affidavit."  *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 888 (1990); *see also Hayes v. N.Y.C. Dep't of Corr.*, 84 F.3d 614, 619 (2d Cir. 1996) ("[F]actual issues created solely by an affidavit crafted to oppose a summary judgment motion are not 'genuine' issues for trial." (citation omitted)).  Thus, the Court does not consider the vague and conclusory allegations in Plaintiff's declaration, which do not create genuine issues of fact for trial.  (*Compare* Decl. of Kim Brown, Dkt. 52, *with* Am. Compl., Dkt. 13; *see also* Mem. & Order on Mot. to Dismiss, Dkt. 28, at 33 n.24 (noting vague and conclusory nature of several of Plaintiff's amended complaint allegations, which the Court here notes are largely identical to the statements in her declaration).)

Dep."), Dkt. 50-3, 8:2–3, 9:6–8; Pl.'s Mem. Opp'n Summ. J., Dkt. 54, at 17.)  In 2008, Plaintiff was appointed as a full-time, tenure-track assistant professor in that department at the College. (Pl.'s Dep., Dkt. 50-3, 9:18–24.)  At that time, she had two master's degrees, and was enrolled in a degree program to obtain her Doctor of Education (also known as an "Ed.D.") at Columbia University's Teachers College.  (*Id.* at 9:25–10:4, 11:19–12:4.)

### A.    CUNY's Tenure Process

The College's tenure process is governed by CUNY's Bylaws and the collective bargaining agreement between CUNY and the Professional Staff Congress ("PSC"), the union that represents CUNY faculty.  (Pl.'s 56.1 Resp., Dkt. 53 ¶ 1.)  Tenure-track faculty at CUNY typically have seven years to meet the requirements for tenure.  (*Id.* ¶ 2.)  Tenure decisions are based on a candidate's scholarship, teaching, and service to their college.  (*Id.*)  To apply for tenure, eligible candidates compile relevant documentation and then submit their tenure application to their department's Personnel & Budget ("P&B") committee.  (*Id.* ¶ 3.)  The departmental P&B committee then votes on the application, recommending for or against tenure for the candidate. (Pl.'s Dep., Dkt. 50-3, 14:6–10.)  If the departmental P&B committee votes against recommending tenure, the candidate is notified and is permitted to go before the departmental P&B committee to discuss the decision.  (*Id.* at 15:23–16:4.)

After the relevant departmental P&B committee votes on a candidate's tenure application, the application is referred to the College-wide P&B Committee, which is comprised of all of the College's department chairs, deans, and the College Provost.  (Pl.'s 56.1 Resp., Dkt. 53 ¶ 4.)  At a meeting of the College-wide P&B Committee, the relevant department chair or dean presents the candidate's case for tenure.  (*Id.* ¶ 5.)  The College President attends this meeting and listens to the substantive discussions, though the President does not routinely receive the tenure applications to review.  (*Id.*)  The College-wide P&B Committee then votes on the candidate's application.  (*Id.*

¶ 6.)  Typically, the College-wide P&B Committee either recommends tenure, recommends against tenure, or recommends that the application be denied subject to renewal under certain conditions. (*Id.*)  Here too, if the Committee votes against recommending tenure, the candidate is notified and can go before the Committee to "speak for themselves."  (Pl.'s Dep., Dkt. 50-3, 16:2–7.)

Next, the President considers both the P&B committees' recommendations and makes an independent recommendation to CUNY's Board of Trustees, which has final authority over tenure decisions.  (Pl.'s 56.1 Resp., Dkt. 53 ¶ 7.)  If a candidate is denied tenure, appeal and grievance processes are available through their union contract.  (Pl.'s Dep., Dkt. 50-3, 17:24–18:16.)

### B.    Plaintiff's First Tenure Application & the Resulting Settlement

Plaintiff first applied for tenure in 2014.  (Pl.'s Dep., Dkt. 50-3, 12:23–25.)  Her departmental P&B committee voted against recommending her for tenure, but she was not notified about the vote against her.  (*Id.* at 19:12–20:8.)  In early 2015, the College-wide P&B Committee also voted against awarding Plaintiff tenure.  (*Id.* at 20:12–18; Pl.'s 56.1 Resp., Dkt. 53 ¶ 8.) Plaintiff retained counsel and filed a grievance about her tenure process.  (Settlement Agreement, Dkt. 51-19, at 1.)  Plaintiff and CUNY signed a settlement agreement in January 2017 (the "Settlement Agreement") that permitted Plaintiff to retain her faculty position for an additional two-year period while she continued to work toward certain performance goals.[3]  (*Id.* at 1–2, 5.) The Settlement Agreement set forth certain "minimum expectations" that Plaintiff was to complete by September 30, 2018, in order to be reappointed and/or awarded tenure by the Board of

---

[3]  The Settlement Agreement also stated that Plaintiff was "entitled to any applicable retroactive pay under the collective bargaining agreement for the period of her employment from April 20, 2012[,] through August 31, 2015," (Settlement Agreement, Dkt. 51-19, at 3), but it did not set forth the exact amount of back pay owed to Plaintiff, (*see id.*).  Plaintiff testified at her deposition that she was not paid the backpay she was owed.  (Pl.'s Dep., Dkt. 50-3, 62:5–6.)

4

Trustees.[4]  (*Id.* at 2, 6.)  Specifically, Plaintiff was required to "complete [her] Ed.D. degree at Teacher's [sic] College, Columbia University," to "publish at least two scholarly articles, monographs, book chapters, or books in peer-reviewed publications in her discipline," and to submit a report as to her progress on these goals no later than September 30, 2018.  (*Id.* at 6.)

### C.    Plaintiff's Progress Toward the Settlement Agreement's Requirements and Reports of Discrimination

About two weeks after the parties signed the Settlement Agreement, Plaintiff contacted CUNY's counsel, Hilary Klein, and asked that certain credentials she already had be treated as "equivalencies"—that is, as a recognized substitute to a doctorate, thereby relieving her of the requirement to earn her Ed.D. degree as set forth in the Settlement Agreement.  (Pl.'s 56.1 Resp., Dkt. 53 ¶ 13.)  Her request was denied.  (*Id.* ¶ 14; *see also* Decl. of Hilary Klein, Dkt. 50-8 ¶¶ 5–6 (Klein explaining she did not believe Plaintiff "satisf[ied] the criteria for acceptance of equivalencies" because "there were no equivalencies in her field").)  A few weeks after that, on February 23, 2017, Plaintiff sent a memo to CUNY's President, Rudolph Crew, and the Provost regarding potential sex and/or race discrimination in an unrelated faculty search process. (2/23/2017 Memo, Dkt. 51-23.[5])

After the parties signed the Settlement Agreement, Plaintiff continued to teach at the College while working toward meeting the minimum requirements set forth by the Settlement

---

[4] Plaintiff asserts in her response to Defendant's Rule 56.1 Statement that the Settlement Agreement "does not mention anything about 'minimum expectations[']" or "minimum requirements."  (*See* Pl.'s 56.1 Resp., Dkt. 53 ¶¶ 9–11.)  This is demonstrably incorrect; the Settlement Agreement, which is part of the evidentiary record, refers to the goals set out for Plaintiff as both "minimum requirements" and "minimum expectations" that she was required to satisfy to be considered for tenure.  (*See* Settlement Agreement, Dkt. 51-19, at 2.)

[5] The February 23, 2017, memo is sent from "Prof. K. Moorning" and signed by "Kim M." (2/23/2017 Memo, Dkt. 51-23.)  Plaintiff previously used the last name Moorning.  (*See, e.g.*, Settlement Agreement, Dkt. 51-19 at 6.)

Agreement.  When Plaintiff received her teaching schedule for the spring 2017 semester, however, it contained a scheduling conflict that precluded her from attending the doctoral colloquium that she needed to take to complete her Ed.D.  (Pl.'s Dep., Dkt. 50-3, 49:23–51:3.)  She contacted both CUNY's human resources director and her department chair, Professor Orandel Robotham, about the schedule conflict.  (*Id.* at 51:4–24, 55:7–16; January 2017 Emails, Dkt. 51-26, at ECF[6] 2–7.)  In her emails to the human resources director, Plaintiff explained that she believed the schedule constituted "disparate treatment."  (January 2017 Emails, Dkt. 51-26, at ECF 5.)  CUNY ultimately resolved the conflict, but not until February, after the colloquium had started, and so Plaintiff was not able to enroll in the course for that semester.  (Pl.'s Dep., Dkt. 50-3, at 52:2–8.)

The following semester, fall 2017, Plaintiff's schedule also contained conflicts—this time with both the colloquium and Plaintiff's dissertation research schedule.  (*Id.* at 59:17–61:10, 71:16–73:12.)  She again reported the conflicts to Professor Robotham as well as to the dean of her school, Jo-Ann Rolle, but was unable to resolve the conflict in time for her to register for and participate in the colloquium.  (*Id.*)  For the spring 2018 semester, Plaintiff's schedule again contained a Thursday evening class that conflicted with her colloquium.  (*Id.* at 77:4–79:2.)  She again reported this conflict to Dean Rolle, explaining that she believed the scheduling conflict was a result of "all the discrimination" she had faced.  (*Id.* at 82:6–11, 83:2–6.)  Though one conflicting class was ultimately removed from Plaintiff's spring 2018 schedule, "one evening class remained," which conflicted with her dissertation research.  (*Id.* at 80:3–17.)  Because of these scheduling conflicts, Plaintiff was unable to complete her Doctor of Education prior to September 30, 2018, as the Settlement Agreement required.  (*See* Progress Report, Dkt. 50-25, at 6.)

---

[6] Citations to "ECF" refer to the pagination generated by the Court's CM/ECF docketing system and not the document's internal pagination.

Plaintiff submitted the Settlement Agreement's required progress report on October 12, 2018—about two weeks after it was due. (*See id.*) The progress report explained that, among Plaintiff's professional achievements, she had "published eight peer-reviewed publications" in the previous two years. (*Id.* at 4.) It also explained that Plaintiff had been unable to complete her Doctor of Education because, during the three previous semesters, her doctoral colloquium was scheduled during a time that she was scheduled to teach at the College. (*Id.* at 6.) Nonetheless, Plaintiff again applied for tenure. (*See* 12/5/2018 Ltr., Dkt. 50-30.)

### D. Plaintiff's Second Tenure Application

On her second tenure application, Plaintiff's departmental P&B committee recommended Plaintiff for tenure. (Pl.'s 56.1 Resp., Dkt. 53 ¶¶ 23, 25.) At the College-wide P&B Committee meeting, Professor Robotham advocated for Plaintiff to be awarded tenure. (*Id.* ¶ 26.) The Committee also voted to recommend Plaintiff for tenure. (*Id.* ¶ 27.) CUNY's President, Crew, then discussed the tenure recommendation with the Provost, per his usual practice. (*Id.* ¶ 29.) President Crew told the Provost that he intended to recommend against tenure for Plaintiff because of her failure to meet the Settlement Agreement's requirements.[7] (*Id.* ¶ 31.) And indeed, President Crew did not recommend Plaintiff for either reappointment or for tenure. (12/5/2018 Ltr., Dkt. 50-30, at 1.) President Crew explained in a letter to Plaintiff that he did not recommend her for tenure because of her "failure to fulfill the required terms of [the Settlement Agreement]," including her failure to complete her Doctor of Education, and her failure to timely submit the required progress report. (*Id.* at 1–2.) The parties dispute whether President Crew knew about the

---

[7] The Provost also testified at his deposition that President Crew stated that he intended to recommend against tenure for Plaintiff because she had misrepresented her academic credentials on her curriculum vitae. (*See* Dep. of Augustine Okerene, Dkt. 51-16, 16:17–17:13.)

schedule conflicts that precluded Plaintiff from attending her doctoral colloquium.  (Pl.'s 56.1 Resp., Dkt. 53 ¶ 32.)[8]

Plaintiff's employment at the College was terminated on January 24, 2019.  (*Id.* ¶ 35.)

## II.    Procedural Background

Plaintiff filed this lawsuit on February 17, 2021, asserting Title VII claims, as well as claims under state and local law, against Defendant CUNY.[9]  (*See* Compl., Dkt. 1.)  The Complaint seeks relief that includes back pay for lost wages; compensatory damages for emotional pain, suffering, and damage to her reputation; an order for Defendant to provide training to its officers, managers, and employees regarding discriminatory workplace harassment and retaliation; and Plaintiff's retroactive reinstatement as a tenured professor.  (*See id.* at 18–19.)  On March 31, 2021, Defendant filed a letter requesting a pre-motion conference for a motion to dismiss, arguing, *inter*

---

[8] Plaintiff also testified at her deposition that Dean Rolle told her that CUNY's in-house attorney, Hilary Klein, "was trying to force [Plaintiff] not to fulfill [her] obligations" under the Settlement Agreement, and was responsible for the scheduling conflicts that Plaintiff faced.  (Pl.'s Dep., Dkt. 50-3, 61:11–62:18.)  Plaintiff further testified that she spoke to President Crew over the phone in November 2018, and he told her that "Hilary Klein told him not to approve" Plaintiff's renewed application for tenure.  (*Id.* at 137:17–140:19.)  Plaintiff's testimony concerning Klein's purported comments to other school officials is hearsay (or, at least, the alleged statement by Klein to Crew is), and therefore cannot be considered as evidence.  *See Selvam v. Experian Info. Sols., Inc.*, 651 F. App'x 29, 31–32 (2d Cir. 2016) (summary order) (explaining that a "party opposing summary judgment 'cannot rely on inadmissible hearsay in opposing a motion for summary judgment[ ] absent a showing that admissible evidence will be available at trial'" (quoting *Burlington Coat Factory Warehouse Corp. v. Esprit De Corp.*, 769 F.2d 919, 924 (2d Cir. 1985)).  Moreover, Klein submitted a declaration in which she stated that she never spoke to Dean Rolle or President Crew about Plaintiff.  (Decl. of Hilary Klein, Dkt. 50-8 ¶¶ 5–6.)  In addition, both President Crew and Dean Rolle denied that they had any such conversations with Klein.  (Decl. of Rudolph Crew, Dkt. 50-4 ¶¶ 33–34; Decl. of Jo-Ann Rolle, Dkt. 50-6 ¶¶ 10–11.)  Indeed, both President Crew and Dean Rolle denied even knowing who Hilary Klein was.  (Decl. of Rudolph Crew, Dkt. 50-4,¶ 34; Decl. of Jo-Ann Rolle, Dkt. 50-6 ¶ 11.)

[9] The original Complaint also named President Crew, Hilary Klein, and another CUNY employee as defendants.  (*See* Compl., Dkt. 1 ¶¶ 9–11.)  In her Amended Complaint, Plaintiff dropped all three individual defendants.  (*See generally* Am. Compl., Dkt. 13.)

*alia*, that any of Plaintiff's claims arising before January 2017 were barred by the Settlement.  (*See* Def.'s 3/31/2021 Ltr. Mot., Dkt. 10.)  Plaintiff thereafter filed an amended complaint bringing the same causes of action against CUNY and the College, while including additional factual allegations related to the Settlement signed between the parties in 2017.  (*See* Am. Compl., Dkt. 13.)  Defendant filed another letter requesting a pre-motion conference for a motion to dismiss, again arguing, *inter alia*, that any claims that arose before the signing of the Settlement Agreement are barred.  (Def.'s 5/18/2021 Ltr. Mot., Dkt. 14.)  Plaintiff responded, explaining that she was "not asserting any claims before signing the [Settlement]" and withdrawing her local law claims.  (*See* Pl.'s 5/25/2021 Ltr., Dkt. 16.)

In 2021, the parties briefed the motion to dismiss.  (Dkts. 22–27.)  In 2022, the Court granted the motion in part and denied it in part.  (*See* Mem. & Order on Mot. to Dismiss, Dkt. 28.)  Specifically, the Court dismissed Plaintiff's hostile work environment claim and her discrimination claim on the basis of national origin, but denied the motion to dismiss as to Plaintiff's discrimination claims on the bases of race and gender, and the retaliation claims.  (*Id.* at 2.)  The Court also dismissed Plaintiff's state and local law claims as withdrawn, or to the extent that they were not withdrawn, as barred based on state sovereign immunity.  (*Id.*)

In November 2022, Defendant answered the Amended Complaint.  (Answer, Dkt. 30.)  The parties then proceeded to discovery, (Dkts. 31–42), which closed in October 2023, (10/24/2023 Dkt. Order).  On November 17, 2023, Defendant requested a pre-motion conference in anticipation of a motion for summary judgment.  (Def.'s 11/17/2023 Ltr. Mot., Dkt. 43.)  Plaintiff responded.  (Pl.'s 11/29/2023 Ltr., Dkt. 45.)  The Court held a pre-motion conference on February 8, 2024, where it set a briefing schedule for Defendant's motion for summary judgment.  (2/8/2024 Min. Entry.)  The parties then briefed the motion, which is now ripe for decision.  (Dkts. 47–55.)

**LEGAL STANDARD**

Summary judgment is appropriate where the submissions of the parties, taken together, "show[] that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251–52 (1986) (explaining that the summary judgment inquiry is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law"). In determining whether a genuine issue of fact exists, the Court must resolve all ambiguities and draw all reasonable inferences against the moving party. *Major League Baseball Props., Inc. v. Salvino, Inc.*, 542 F.3d 290, 309 (2d Cir. 2008). The Court also construes any disputed facts in the light most favorable to the nonmoving party. *See Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157–59 (1970). "[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of material fact." *Anderson*, 477 U.S. at 247–48 (emphasis in original).

A dispute of fact is "genuine" if "the [record] evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* at 248. The initial burden of "establishing the absence of any genuine issue of material fact" rests with the moving party. *Zalaski v. City of Bridgeport Police Dep't*, 613 F.3d 336, 340 (2d Cir. 2010). Once this burden is met, however, the burden shifts to the nonmoving party to put forward some evidence establishing the existence of a question of fact that must be resolved at trial. *Spinelli v. City of New York*, 579 F.3d 160, 166–67 (2d Cir. 2009); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986). A mere "scintilla of evidence" in support of the nonmoving party is insufficient; "there must be evidence on which the jury could reasonably find for the [non-movant]." *Hayut v. State Univ. of N.Y.*, 352 F.3d 733, 743 (2d Cir. 2003) (citation omitted) (alteration in original). In other words, "[t]he nonmoving

10

party must come forward with specific facts showing that there is a genuine issue for trial." *Caldarola v. Calabrese*, 298 F.3d 156, 160 (2d Cir. 2002) (citation omitted); *see also Gorzynski v. JetBlue Airways Corp.*, 596 F.3d 93, 101 (2d Cir. 2010) (explaining that a plaintiff must "show more than 'some metaphysical doubt as to the material facts'" to survive summary judgment (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986))).

## DISCUSSION

### I.  Disparate Treatment Claims

#### A.  Legal Standard

The three-step burden-shifting framework set forth by the Supreme Court in *McDonnell Douglas* provides the framework for analyzing Title VII disparate treatment claims based on race and gender.  *See McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973); *Littlejohn v. City of New York*, 795 F.3d 297, 312 (2d Cir. 2015).  Under this framework, "[f]irst, the plaintiff has the burden of proving by the preponderance of the evidence a prima facie case of discrimination." *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 510–11 (2002) (quoting *Tex. Dep't of Cmty. Affs. v. Burdine*, 450 U.S. 248, 255 n.8 (1981)).  To make out a *prima facie* case of discrimination at this stage of the litigation, a plaintiff must raise a genuine question of material fact "by showing that: '(1) she is a member of a protected class; (2) she is qualified for her position; (3) she suffered an adverse employment action; and (4) the circumstances give rise to an inference of discrimination.'" *Vega v. Hempstead Union Free Sch. Dist.*, 801 F.3d 72, 83 (2d Cir. 2015) (quoting *Weinstock v. Columbia Univ.*, 224 F.3d 33, 42 (2d Cir. 2000)).  Thus, to preclude summary judgment on a disparate treatment claim for race and/or gender discrimination, a plaintiff must raise a genuine question of material fact as to whether their race and/or gender was a "'substantial' or 'motivating' factor contributing to the employer's decision to take the [adverse] action."  *Id.* at 85 (quoting *Price Waterhouse v. Hopkins*, 490 U.S. 228, 249 (1989) (plurality opinion)).  After a plaintiff

11

establishes the *prima facie* case, the burden shifts to the employer to articulate a legitimate, non-discriminatory reason for the adverse employment action. *See id.* at 83; *McDonnell Douglas*, 411 U.S. at 802. The burden then shifts back to the plaintiff to present evidence that the employer's proffered reason is pretext for an impermissible motivation. *See Vega*, 801 F.3d at 83; *McDonnell Douglas*, 411 U.S. at 804. If the plaintiff cannot establish pretext, the employer is entitled to summary judgment. *James v. N.Y. Racing Ass'n*, 233 F.3d 149, 154 (2d Cir. 2000).

Notably, courts in this Circuit have long recognized that tenure decisions in the university context involve a combination of factors that tend to set them apart from other employment decisions. *See Feinson v. New Sch. for Soc. Rsch.*, No. 95-CV-0763 (MBM) (THK), 1997 WL 742532, at *9 (S.D.N.Y. Dec. 1, 1997) (citing *Zahorik v. Cornell Univ.*, 729 F.2d 85, 92 (2d Cir. 1984)). For example, "tenure candidates are [generally] not competing with, nor compared to, other tenure candidates," but rather "evaluated based on their own merit and on the institution's needs." *Id.* As a result, courts are reluctant to review the merits of tenure decisions. *See id.* (collecting cases).

## B. A Reasonable Jury Could Not Find That Race and/or Gender Motivated Defendant's Actions

Defendant does not dispute that Plaintiff is a member of a protected class as a Black woman, that Plaintiff was qualified for tenure, or that the scheduling conflicts and denial of tenure were adverse employments actions. (*See* Def.'s Mem. Supp. Summ. J., Dkt. 50-9, at 12–17.) Instead, Defendant argues that "[P]laintiff has failed to present any admissible evidence that discrimination . . . played any role in [the adverse employment] actions," (*id.* at 13), because the record demonstrates that no decisionmaker took any "adverse action [against Plaintiff] based on

her race or gender," (*id.* at 14). While Plaintiff's brief is not exactly a model of clarity,[10] in response to Defendant's motion, she primarily argues that she raises an inference of discrimination on the basis of race and/or gender because of the circumstances surrounding the adverse employment actions Plaintiff faced. (Pl.'s Mem. Opp'n Summ. J., Dkt. 54, at 17.) Specifically, Plaintiff points to the events surrounding the following alleged adverse actions: (1) the denial of her tenure application, (*id.* at 19–24); (2) the scheduling conflicts she faced, (*id.*); and, (3) her disproportionately heavy workload, (*id.* at 19–22).

The Court, however, agrees with Defendant; Plaintiff has not identified any evidence suggesting that her race and/or gender was a "'substantial' or 'motivating' factor contributing to [her] employer's decision to take the [adverse] action." *Vega*, 801 F.3d at 85 (citation omitted). Consequently, a jury could not find that Plaintiff has established the *prima facie* case of race or gender discrimination, and summary judgment is warranted on Plaintiff's disparate treatment claims. The Court addresses Plaintiff's principal arguments in turn.[11]

---

[10] Similarly, while Plaintiff has submitted a relatively voluminous set of exhibits, as explained in footnote 2, *supra*, she has not submitted a counter-statement of material facts, and her opposition brief is notably light on citations to evidence in the record. (*See* Pl.'s 56.1 Resp.; Pl.'s Mem. Opp'n Summ. J., Dkt. 54.) While the Court is permitted to consider materials in the record that are not cited in the parties' submissions, it is not required to do so. *See* Fed. R. Civ. P. 56(c)(3). As the Second Circuit has explained, it is not the Court's role "to scour the record . . . and serve generally as an advocate" for Plaintiff. *Sioson v. Knights of Columbus*, 303 F.3d 458, 460 (2d Cir. 2002) (citation omitted). Thus, while the Court has reviewed, and relies on, some of the key documents that Plaintiff herself did not rely on in her brief (such as her deposition transcript), the Court has not scoured the record in its entirety.

[11] Some of Plaintiff's arguments are so far-fetched that the Court does not address them. For example, in her opposition brief, Plaintiff argues that the existence of a class action lawsuit against the New York State Education Department regarding a teacher credentialing requirement that the state legislature enacted in 1991 demonstrates racial and/or gender bias on the part of President Crew because he was Chancellor of the State Education Department from 1995 until 1999. (*Compare* Pl.'s Mem. Opp'n Summ. J., Dkt. 54, at 24, *with* Def.'s Mem. Supp. Summ. J., Dkt. 50-9, at 18 n.10); *see also Gulino v. N.Y. State Educ. Dep't*, 460 F.3d 361, 366–69 (2d Cir. 2006) (describing the state legislation that caused the State Education Department to enact disputed credentialing requirement). To the extent that those events reflect on President Crew at all, they

1.    <u>Denial of Plaintiff's Second Tenure Application</u>

Defendant argues that the record demonstrates as a matter of law that President Crew recommended against awarding Plaintiff tenure because of her failure to fulfill the required terms of the Settlement Agreement, including completing her Doctor of Education, and timely submitting the required progress report.  (Def.'s Mem. Supp. Summ. J., Dkt. 50-9, at 9; 12/5/2018 Ltr., Dkt. 50-30; Pl.'s 56.1 Resp., Dkt. 53 ¶ 33.)  In response, Plaintiff makes many different arguments about how the denial of tenure raises an inference of discrimination on the basis of race or sex.  (*See generally* Pl.'s Mem. Opp'n Summ. J., Dkt. 54.)  The Court does not find any of Plaintiff's arguments persuasive, as described below.

First, Plaintiff argues that President Crew's recommendation against tenure raises an inference of discrimination because he previously "stated that he would follow the recommendations of the local and collegewide P and B committees unless there was a real reason to override them," and here, he did override the committees' recommendations.  (Pl.'s Mem. Opp'n Summ. J., Dkt. 54, at 20 (citing Dep. of Rudolph Crew, Dkt. 51-18, 39).)  President Crew did testify at his deposition that when tenure decisions are "cut and dry," he typically follows the recommendations of the P&B committees.  (Dep. of Rudolph Crew, Dkt. 51-18, 38:12–41:11.) His refusal to do so here, however, does not *ipso facto* raise an inference of discrimination, given that Plaintiff did not fulfill the "minimum requirements" to receive tenure pursuant to the Settlement Agreement.  (*See* Settlement Agreement, Dkt. 51-19, at 2; Def.'s Mem. Supp. Summ.

---

are much too attenuated to offer any probative value here.  Similarly, at her deposition, Plaintiff posited far-fetched theories to explain why she believes that the relevant decisionmakers were biased against her, including suggesting that President Crew, who is Black, is biased against Black women because he "is married to a white woman."  (Pl.'s Dep., Dkt. 50-3, 165:24–166:4.)  The Court does not find that these types of implausible allegations merit discussion, whether put forth by Plaintiff or her counsel.

J., Dkt. 50-9, at 18–19.)  Indeed, given that this was Plaintiff's second tenure application process, and that it was governed, at least in part, by the Settlement Agreement, Plaintiff's process was not "cut and dry."  Rather, in addition to the normal criteria required for a grant of tenure, Plaintiff was subject to additional requirements based on the Settlement Agreement—most significantly, getting her Ed.D.—such that it was reasonable for President Crew not to follow the recommendation of the P&B committees and deny tenure based on the facts presented to him, including that Plaintiff had not obtained her Ed.D.  Thus, President Crew's decision to go against the P&B committees' recommendation does not raise an inference of discrimination.

Plaintiff also argues—without citation to record evidence—that she was treated less well than her non-Black and/or male colleagues because at least one of them was tenured despite his not having a master's degree or a doctorate, (Pl.'s Mem. Opp'n Summ. J., Dkt. 54, at 23), and because, "on information and belief" the College "had never hired any natural-born American citizen and females [sic] in [Plaintiff's] Dept [sic] in a full-time faculty position," (*id.*).  Because Plaintiff has not cited any evidentiary support for these arguments, they do not raise a genuine question of material fact.  *See Collins v. City of New York*, No. 14-CV-8815 (AJN), 2017 WL 11582468, at *2 (S.D.N.Y. July 10, 2017) (explaining that "'[a]t least in a counseled case,' it is "not the Court's job' to 'look into the record to document the 'facts' posited in [Plaintiff's brief]'" (quoting *Sioson*, 303 F.3d at 460) (cleaned up)); *Bey v. State of New York*, No. 11-CV-3296 (JS) (WDW), 2013 WL 3282277, at *6 (E.D.N.Y. June 25, 2013) ("It is well-established that courts cannot make a party's arguments for it or fill in the blanks on that party's behalf." (citation omitted) (cleaned up)).  Plus, statements made "on information and belief" are insufficient to overcome summary judgment.  *SCR Joint Venture L.P. v. Warshawsky*, 559 F.3d 133, 138 (2d Cir. 2009).

Plaintiff also argues that "in the preceding three years (2016 to 2019), every candidate that was recommended for tenure was granted tenure," besides her, and that this raises an inference of discrimination based on race and/or sex. (Pl.'s Mem. Opp'n Summ. J., Dkt. 54, at 24 (citing P&B Records, Dkt. 51-28).) In support of this argument, Plaintiff cites an exhibit that she describes, without further explanation, as "2017-2019 P&B Votes." (Decl. of Stewart Lee Karlin, Dkt. 51, at ECF 2.) The document does seem to be an official CUNY document containing records of the College-wide P&B Committee's tenure votes. (*See* P&B Records, Dkt. 51-28, at ECF 2–22.) But it does not provide any information, as far as this Court can discern, as to what happened after the College-wide P&B Committee voted on these candidates—i.e., it is not clear whether any of these candidates actually received tenure after the College-wide P&B Committee voted in favor of granting them tenure.[12] (*See id.*) Thus, the cited evidence does not stand for the proposition that "every candidate that was recommended for tenure was granted tenure," (Pl.'s Mem. Opp'n Summ. J., Dkt. 54, at 24), and so this argument does not support an inference of discrimination.

Finally, Plaintiff also argues that by denying her tenure after the College-wide P&B Committee voted in favor of awarding Plaintiff tenure, "CUNY violated its policies and guidelines for tenure." (Pl.'s Mem. Opp'n Summ. J., Dkt. 54, at 23.) Plaintiff then lists several allegedly violated policies, including: "CUNY By-Law Article 9 Sections 1&.2 [sic], PSC/CUNY Contract Article 18.3 and CUNY General Policy 5.151; CUNY By-Law Article 11 Sections 5, 7 & 8." (*Id.*) Plaintiff, however, does not include citations that locate these policies in the record, nor does she explain how exactly CUNY violated the various policies. Indeed, though Plaintiff filed as exhibits two different documents titled "CUNY Bylaws," (*see* Dkts. 51-9, 51-20), "Article 11" in those

---

[12] Notably, the College-wide P&B Committee voted against recommending tenure in some instances. (P&B Records, Dkt. 51-28, at ECF 9, 22.)

documents does not contain sections seven or eight to which Plaintiff purportedly cites, (*see id.*). Further, the record does not appear to contain the relevant sections of the PSC/CUNY contract Plaintiff references, nor the "CUNY General Policy." (*See* Decl. of Clement J. Colucci, Dkt. 50-2; Decl. of Stewart Lee Karlin, Dkt. 51.)  Again, the Court declines to "fill in the blanks on [Plaintiff's] behalf" by seeking out these documents, and thus does not consider this argument. *Bey*, 2013 WL 3282277, at *6 (citation omitted).

### 2.    Scheduling Issues

Plaintiff also argues that the scheduling issues she faced give rise to an inference of discrimination.  (Pl.'s Mem. Opp'n Summ. J., Dkt. 54, at 21–22.)  For example, she states that "she was given a schedule full of conflicts and very complicated as opposed to other male counterparts who were not African American," and then lists four individuals.  (*Id.* at 21.)  She does not, however, explain what the would-be comparators' schedules were or how those schedules compared to her own, nor does she provide citations to any supporting documents apart from her own declaration.  (*See id.*)  While Plaintiff's allegations along these lines were sufficient for this claim to survive a motion to dismiss, (*see* Mem. & Order on Mot. to Dismiss, Dkt. 28, at 22–23), these allegations, without more, are insufficient to raise a genuine question of material fact as to discrimination at the summary judgment stage, *see Caldarola*, 298 F.3d at 160 (explaining that to survive summary judgment, "[t]he nonmoving party must come forward with *specific facts* showing that there is a genuine issue for trial" (emphasis added)); (*see also* n.2 *supra* (describing insufficiencies of Plaintiff's declaration)).

While the Court is sympathetic to her argument that the scheduling conflicts, which the parties seem to agree prevented Plaintiff from completing her Ed.D. coursework, unfairly contributed to President Crew's decision to deny her tenure, there is still no evidence showing that any unfairness with respect to the scheduling conflicts or tenure decision was motivated by racial

and/or gender animus by President Crew or CUNY. The mere fact that Plaintiff is a Black woman and President Crew a Black man is insufficient to prove that his decision was motivated by race and/or gender bias. Furthermore, as previously noted, judicial second-guessing of university tenure decisions is generally discouraged because of the many factors that go into those decisions. *See Feinson*, 1997 WL 742532, at *9 ("[T]enure candidates are [generally] not competing with, nor compared to, other tenure candidates," but rather "evaluated based on their own merit and on the institution's needs.").

3. Plaintiff's Workload

Plaintiff also argues that "[b]etween 2017 and 2018, the Defendants [sic] discriminated and retaliated against Plaintiff by overloading her schedule and work assignments." (Pl.'s Mem. Opp'n Summ. J., Dkt. 54, at 20.) In its Memorandum and Order on the motion to dismiss, however, the Court found that Plaintiff's allegations concerning her "disproportionately heavy workload" were too conclusory to support her Title VII claim. (Mem. & Order on Mot. to Dismiss, Dkt. 28, at 20–21.) The Court explained that "should Plaintiff develop additional evidence demonstrating a connection between her allegedly increased workload and being unable to complete her doctoral course work, she [could] seek to amend her complaint to re-allege this aspect of her discrimination claim." (*Id.* at 21 n.16.) Plaintiff did not amend her complaint after the Court ruled on the motion to dismiss. Consequently, the Court does not consider Plaintiff's present arguments regarding her allegedly overburdensome workload, which it previously explained it would not consider without amendment of the operative complaint. (*See id.*; *see also* Pl.'s Mem. Opp'n Summ. J., Dkt. 54, at 19–22.)[13]

---

[13] The Court also notes that, aside from her own conclusory statements, (*see, e.g.*, Pl.'s 56.1 Resp., Dkt. 53 ¶ 18), Plaintiff fails to identify any evidence showing a causal connection between her workload and not completing her doctoral coursework.

* * *

Because Plaintiff has failed to present any admissible evidence that discrimination played a role in the adverse employment actions she experienced, Plaintiff is unable to establish the *prima facie* case of disparate treatment. Defendant's motion for summary judgment is therefore granted on Plaintiff's remaining discrimination claims.

## II.    Retaliation Claim

### A.    Legal Standard

Title VII prohibits employers from "discriminat[ing] against any of [their] employees" for engaging in protected activities, including making "a charge, testif[ying], assist[ing] or participat[ing] in any manner in an investigation." 42 U.S.C. § 2000e-3(a). In evaluating retaliation claims, courts again rely on the *McDonnell Douglas* framework. *Zann Kwan v. Andalex Grp.*, 737 F.3d 834, 843 (2d Cir. 2013). "Under the first step of the *McDonnell Douglas* framework [for retaliation claims], the plaintiff must establish a prima facie case of retaliation by showing 1) 'participation in a protected activity'; 2) the defendant's knowledge of the protected activity; 3) 'an adverse employment action'; and 4) 'a causal connection between the protected activity and the adverse employment action.'" *Id.* at 844 (quoting *Jute v. Hamilton Sundstrand Corp.*, 420 F.3d 166, 173 (2d Cir. 2005)). A plaintiff's burden in establishing that she has participated in a protected activity is "de minimis." *Id.* (quoting *Jute*, 420 F.3d at 173). "A 'protected activity' refers to action taken to protest or oppose statutorily prohibited discrimination." *Wimes v. Health*, 157 F. App'x 327, 328 (2d Cir. 2005) (summary order) (citation omitted). Thus, "[t]o prevail on a retaliation claim, 'the plaintiff need not prove that her underlying complaint of discrimination had merit,' but only that it was motivated by a 'good faith, reasonable belief that the underlying employment practice was unlawful.'" *Zann Kwan*, 737 F.3d at 843 (first quoting *Lore v. City of Syracuse*, 670 F.3d 127, 157 (2d Cir. 2012); then quoting *Reed v. A.W.*

19

*Lawrence & Co.*, 95 F.3d 1170, 1178 (2d Cir. 1996) (cleaned up)).  "[P]roof of causation can be shown either: (1) indirectly, by showing that the protected activity was followed closely by discriminatory treatment, or through other circumstantial evidence such as disparate treatment of fellow employees who engaged in similar conduct; or (2) directly, through evidence of retaliatory animus directed against the plaintiff by the defendant." *Hicks v. Baines*, 593 F.3d 159, 170 (2d Cir. 2010) (quoting *Gordon v. N.Y.C. Bd. of Educ.*, 232 F.3d 111, 117 (2d Cir. 2000)).

"In determining whether this initial burden is satisfied in a Title VII retaliation claim, the court's role in evaluating a summary judgment request is to determine only whether proffered admissible evidence would be sufficient to permit a rational finder of fact to infer a retaliatory motive." *Jute*, 420 F.3d at 173.  "Once the plaintiff has established a prima facie showing of retaliation, the burden shifts to the employer to articulate some legitimate, non-retaliatory reason for the employment action." *Zann Kwan*, 737 F.3d at 845 (citing *United States v. Brennan*, 650 F.3d 65, 93 (2d Cir. 2011)).  To survive summary judgment, the plaintiff must then put forth sufficient evidence from which a jury could conclude that the "non-retaliatory reason [was] a mere pretext for retaliation." *Id.* at 845.

### B.   A Reasonable Jury Could Not Infer Any Causal Connection Between the Protected Activities and Adverse Actions

Defendant argues that Plaintiff's retaliation claim fails because (1) Plaintiff cites evidence of only one protected activity[14]; and (2) she has not raised sufficient evidence of a causal connection between her protected activity and the adverse actions.  (Def.'s Mem. Supp. Summ. J.,

---

[14] In its opening brief, Defendant argued that Plaintiff had not engaged in any timely protected activities, (*see* Def.'s Mem. Supp. Summ. J., Dkt. 50-9, at 20), but in its reply brief, it conceded that Plaintiff engaged in a protected activity when she complained "in February 2017 about alleged discrimination in a departmental faculty search," (Def.'s Reply, Dkt. 50-32, at 7).

Dkt. 50-9, at 19–21; Def.'s Reply, Dkt. 50-32, at 3–7.)  The Court finds that Plaintiff has not identified any evidence, apart from temporal proximity, that suggests her protected activities were a but-for cause of any adverse actions she experienced, and that the relatively attenuated temporal proximity here is insufficient to raise a genuine question of material fact as to the necessary causal connection.  Thus, her retaliation claim must also be dismissed.

### 1.    Protected Activities

Plaintiff contends that she participated in two different types of protected activities: first, that she made a litany of reports about her scheduling conflicts, which she viewed as discriminatory and/or retaliatory, and second, that she sent a memorandum to President Crew and the Provost on February 23, 2017, in which she reported bias and exclusion of women in the search for faculty in her department.  (*See* Pl.'s Mem. Opp'n Summ. J., Dkt. 54, at 17–18 (first citing Objs. Hiring Discrimination, Dkt. 51-23; then citing Conflict and Complaint Notices, Dkt. 51-26).)  Defendant admits that Plaintiff's February 23, 2017 memorandum constitutes a protected activity.  (Def.'s Reply, Dkt. 50-32, at 7.)  Thus, the only alleged protected activities in dispute are Plaintiff's reports about the scheduling issues.  Plaintiff testified that she made many reports about these issues, but the evidence does not demonstrate that Plaintiff connected the scheduling issues to discrimination or retaliation in most of her reports.  (*See, e.g.*, Pl.'s Dep., Dkt. 50-3, 51:4–51:24, 55:7–16, 59:17–61:10, 71:16–7363, 77:4–79:2.)  Where, as here, there is no indication that a plaintiff's employer would have understood [their] reports as "complaining of conduct prohibited by Title VII," the reports do not constitute protected activities.  *Kelly v. Howard I. Shapiro & Assocs. Consulting Eng'rs, P.C.*, 716 F.3d 10, 15–16 (2d Cir. 2013).

Resolving all ambiguities and drawing all reasonable inferences in Plaintiff's favor, as the non-moving party, *Major League Baseball Props., Inc.*, 542 F.3d at 309, the Court finds that Plaintiff raises a genuine question of material fact as to whether two of her reports about the

scheduling conflicts reasonably would have led Defendant to understand that Plaintiff was engaged in a protected activity: first, in her January 27, 2017 email to the College's human resources representative, in which she stated that she thought her schedule was the result of "disparate treatment," (January 2017 Emails, Dkt. 51-26,[15] at ECF 3, 5); and second, in her deposition testimony about a conversation with Dean Rolle in early 2018, during which she told Dean Rolle that "that this [scheduling] conflict was continual discrimination." (Pl. Dep, Dkt. 50-3, 83:5–83:15.)[16] The Court, therefore, finds that Plaintiff has raised a genuine question of material fact that she engaged in three protected activities total: (1) her February 23, 2017 memorandum reporting potential discrimination in hiring women to her department; (2) her January 2017 emails with human resources about her scheduling conflicts; and (3) her conversation with Dean Rolle in early 2018 again about her scheduling conflicts.[17]

---

[15] In addition to the emails from January 2017, Plaintiff's Exhibit 26 (Dkt. 51-26) contains a number of inexplicable documents. For example, page 9 of this document is a largely blank page that states at the top "Fall 2017 Conflict" and then states "Notices to . . ." followed by the names of three individuals. (*See id.* at ECF 9.) Similar documents appear throughout the exhibit. (*See id.* at ECF 11, 25.) In addition, Plaintiff's Exhibit 26 contains a document titled "Affidavit of Professor Kim Moorning" that discusses "Discrimination in Employment" at CUNY and various perceived issues regarding the Settlement Agreement and Plaintiff's tenure process. (*See id.* at ECF 18–24; *see supra* n.5 (Plaintiff previously used the name "Kim Moorning").) It is not clear what the purpose of these documents is, who created them, or to whom (if anyone) they were sent. Thus, the Court does not consider the "affidavit" or "notices" contained in Plaintiff's Exhibit 26.

[16] Admittedly, Plaintiff's testimony was not exactly clear as to what she reported to Dean Rolle in early 2018 or when she made that report. (Pl Dep., Dkt. 53, 82:6–17 (Plaintiff testifying that she could not recall the exact date of her conversation with Dean Rolle); *id.* at 83:5–13 (stating generally that she and Dean Rolle discussed "all the discrimination" and "that this conflict was continual discrimination").) But because the Court must resolve all ambiguities and draw all reasonable inferences against the Defendant at this stage of the litigation, *Major League Baseball Props., Inc.*, 542 F.3d at 309, the Court finds that this testimony raises a genuine question of material fact as to whether Plaintiff's conversation with Dean Rolle in early 2018 constituted a protected activity of which Defendant had notice.

[17] Plaintiff states in her declaration that she complained about discrimination at other times, (*see, e.g.*, Pl. Decl., Dkt. 52 ¶¶ 26–27, 47, 50), but the Court does not consider statements made in Plaintiff's declaration, (*see* n.2 *supra*), and so those statements do not raise a genuine question of

2.     Adverse Employment Actions

Plaintiff asserts that she experienced three adverse employment actions in retaliation for her protected activity: (1) the scheduling conflicts; (2) the denial of tenure (and resulting termination), and (3) her heavy workload.  (Pl.'s Mem. Opp'n Summ. J., Dkt. 54, at 20–23.)  For the purposes of a retaliation claim, an adverse employment action is one that "well might have dissuaded a reasonable worker from making or supporting a charge of discrimination."  *Kessler v. Westchester Cnty. Dep't of Soc. Servs.*, 461 F.3d 199, 207 (2d Cir. 2006) (quoting *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006)).  This standard is lower than the standard for what constitutes an adverse action for purposes of a discrimination claim.  *Carpenter v. City of Mount Vernon*, 198 F. Supp. 3d 272, 282 (S.D.N.Y. 2016).  Thus, an employment action can form the basis of a retaliation claim, even if it is not sufficiently adverse for the purposes of a discrimination claim.  *Bowman v. N.Y. State Hous. & Cmty. Renewal*, No. 18-CV-11596 (ER), 2020 WL 1233701, at *7 (S.D.N.Y. Mar. 13, 2020) (citation omitted).

Here, Defendant does not dispute that the adverse actions claimed by Plaintiff could constitute adverse actions for her retaliation claim.  (*See* Def.'s Mem. Supp. Summ. J., Dkt. 50-9, at 19–21; Def.'s Reply, Dkt. 50-32, at 6–9.)  But in ruling on Defendants' motion to dismiss, the Court held that the "additional work assignments [Plaintiff] received . . . do not constitute adverse employment actions," and that if Plaintiff wanted to rely on her increased workload, she would need "to amend her complaint to re-plead this aspect of her retaliation claim."  (Mem. & Order on Mot. to Dismiss, Dkt. 28, at 31 & 32 n.23) (noting that "[c]ourts have recognized that additional work assignments generally do not constitute adverse actions for purposes of a retaliation claim"

---

material fact as to whether Plaintiff engaged in protected activities at other times, *see Hayes*, 84 F.3d at 619 ("[F]actual issues created solely by an affidavit crafted to oppose a summary judgment motion are not 'genuine' issues for trial." (citation omitted)).

and finding that, "[e]ven drawing reasonable inferences in [Plaintiff's] favor, . . . the additional work assignments she received are the type of 'minor annoyances' that do not constitute adverse employment actions in retaliation claims" (citations omitted)).)  Plaintiff did not do so, and so the Court does not consider her allegedly increased workload as an adverse action.  Because Defendant does not challenge Plaintiff's scheduling conflicts or denial of tenure as protected activities, the Court assumes, without deciding, that they are.

### 3.    Causal Connection

Plaintiff alleges that the temporal proximity between her protected activities and the adverse actions she experienced demonstrates the requisite causal connection.  (Pl.'s Mem. Opp'n Summ. J., Dkt. 54, at 18.)  "[M]ere temporal proximity between an employer's knowledge of protected activity and an adverse employment action" can be "sufficient evidence of causality to establish a prima facie case" if the temporal proximity is "very close." *Clark Cnty. Sch. Dist. v. Breeden*, 532 U.S. 268, 273 (2001) (quoting *O'Neal v. Ferguson Constr. Co.*, 237 F.3d 1248, 1253 (10th Cir. 2001)).  Though the Second Circuit has "fastidiously avoided drawing a 'bright line' defining the outer limits 'beyond which a temporal relationship is too attenuated to establish causation," Second Circuit case law strongly suggests that "an adverse employment action within five months of protected activity is sufficient to establish a *prima facie* case of retaliation." *De Figueroa v. New York State*, No. 17-CV-0436 (PKC) (LB), 2022 WL 4111028, at *8 (E.D.N.Y. Sept. 8, 2022) (quoting *Gorman-Bakos v. Cornell Co-op Extension of Schenectady Cnty.*, 252 F.3d 545, 554 (2d Cir. 2001)) (collecting cases).

As explained above, a jury could find that Plaintiff engaged in three protected activities: (1) the February 23, 2017 memorandum reporting potential discrimination in department hiring, (2) the January 2017 emails with human resources complaining about scheduling conflicts, and (3) her conversation with Dean Rolle regarding the same topic in early 2018.  (*See* Discussion Section

24

II.B.1 *supra*.)  The adverse actions, however, each took place either before any of the protected activities, or many months after.  The scheduling conflicts arose, respectively, at the start of the spring 2017 semester, the start of the fall 2017 semester, and the start of the spring 2018 semester. (Pl.'s Dep., Dkt. 50-3, 49:23–51:24, 55:7–16, 59:17–61:10, 71:16–73:3, 77:4–79:2.)  The conflict that arose at the start of the spring 2017 semester is irrelevant for the purposes of this analysis because it took place before any of Plaintiff's protected activities.  *See Risco*, 868 F. Supp. 2d at 113 (explaining that adverse actions that "occurred prior to [the plaintiff's] protected activity . . . cannot be considered retaliatory).  With respect to the scheduling conflict that arose at the start of the fall 2017 semester, i.e., September 2017, Plaintiff's closest-in-time protected activity was the February 2017 memo regarding discrimination in hiring.  By the time the fall 2017 scheduling issue arose, approximately six months had passed since Plaintiff sent the memo. Similarly, when the scheduling conflict arose at the start of the spring 2018 semester—that is, in or around January 2018—it had been almost a year since Plaintiff sent the February 23, 2017 memo reporting discrimination in hiring practices.  (2/23/2017 Memo, Dkt. 51-23.)  Although Plaintiff testified that she complained to Dean Rolle about discrimination at the start of the spring 2018 semester, the evidence does not establish the timing of that conversation vis-à-vis the spring 2018 scheduling conflict.  (Pl.'s Dep., Dkt. 50-3, 83:5–13.)  Plaintiff could not recall exactly when her conversation with Dean Rolle took place, and could only place it during the spring 2018 semester.  (*Id.* at 82:6–11.)  Because this conversation took place during the semester, the spring 2018 class schedule—and hence the scheduling conflict—presumably would have been set already.  Finally, the denial of tenure took place at the end of 2018, nearly a year after Plaintiff's conversation with Dean Rolle, which was Plaintiff's last protected activity.  (12/5/2018 Ltr., Dkt. 50-30.)

As an initial matter, the nearly year-long gaps between Plaintiff's closest-in-time adverse action and (1) the spring 2018 schedule conflicts, and (2) the denial of tenure, are too attenuated to raise an inference of causation on their own.  *See Brown v. City of New York*, No. 14-CV-2668 (PAE), 2014 WL 5861995, at *2 (S.D.N.Y. Nov. 12, 2014) (finding that "almost a year" between plaintiff's latest-in-time protected activity and the first adverse action did not give rise to an inference of retaliation), *aff'd*, 622 F. App'x 19 (2d Cir. 2015) (summary order); *Herling v. N.Y.C. Dep't of Educ.*, No. 13-CV-5287 (JG), 2014 WL 1621966, at *10 (E.D.N.Y. Apr. 23, 2014) (same); *Jackson v. Elmhurst Hosp. Ctr.*, No. 10-CV-5248 (RRM) (RER), 2012 WL 868965, at *8 (E.D.N.Y. Mar. 14, 2012) (finding that five months to a year between the protected activities and adverse action was insufficient to give rise to a causal connection); *Babarinsa v. Kaleida Health*, 58 F. Supp. 3d 250, 266 (W.D.N.Y. 2014) (finding 10 month gap insufficient to raise inference of discrimination), *aff'd*, 622 F. App'x 36 (2d Cir. 2015) (summary order).

It is a closer call whether the six-month gap between Plaintiff's February 23, 2017 memo reporting discrimination in hiring and the scheduling conflict she faced in September 2017, standing alone, constitute the requisite "very close" temporal proximity necessary to raise a question of material fact as to a causal connection.  *See Clark Cnty. Sch. Dist.*, 532 U.S. at 273–74 (citation omitted); *see also Moy v. Napoli Shkolnik, PLLC*, No. 23-CV-3788 (DEH), 2024 WL 3498131, at *12 (S.D.N.Y. July 22, 2024) ("Whether the six-month gap between [the plaintiff's] protected activity and her termination was too long to raise an inference of discrimination is a close call." (citation omitted)).  That said, many courts within this Circuit have found a six-month time period between a protected activity and an adverse action to be too attenuated to establish causation.  *See, e.g.*, *Chukwueze v. NYCERS*, 891 F. Supp. 2d 443, 445–58 (S.D.N.Y. 2012) (finding that temporal proximity of "somewhere between three and six months []

26

is insufficient, standing alone, to establish a causal connection" and collecting cases); *Mitura v. Finco Servs., Inc.*, No. 23-CV-2879 (VEC), 2024 WL 1160643, at *3 (S.D.N.Y. Mar. 18, 2024) ("Plaintiff relies entirely on an inference of causation based on temporal proximity, and six months is just too long."); *Jackson*, 2012 WL 868965, at *8 (finding that five months to a year between the protected activities and adverse action was insufficient to give rise to a causal connection). "Ultimately, it is for the Court to 'exercise its judgment about the permissible inferences that can be drawn from temporal proximity in the context of particular cases.'" *Williams v. A Team Sec., Inc.*, No. 20-CV-1568 (LDH) (VMS), 2023 WL 2742247, at *7 (E.D.N.Y. Mar. 31, 2023) (quoting *Espinal v. Goord*, 558 F.3d 119, 129 (2d Cir. 2009)). "In the cases in which there have been relatively lengthy gaps between the protected activity and the adverse employment action[,] . . . there has generally been other evidence to suggest retaliation" if the claim is to survive. *Fraser v. MTA Long Island R.R.*, 307 F. Supp. 3d 105, 116 (E.D.N.Y. 2018).

Here, the Court finds that Plaintiff has not raised the necessary inference of causation. Apart from the attenuated temporal proximity, Plaintiff does not point to any other evidence in the record that might suggest a retaliatory motive. (*See generally* Pl.'s Mem. Opp'n Summ. J., Dkt. 54, at 19–24.)[18]  Moreover, Defendant points to evidence that strongly suggests a lack of causal

_____

[18] Plaintiff implies that CUNY had limited opportunities to retaliate against her due to the College's semester schedule. (*See* Pl.'s Mem. Opp'n Summ. J., Dkt. 54, at 22 ("Due to the summer break, Defendant's next opportunity to further discriminate and retaliate against Plaintiff was during the Fall semester of 2017.").)  At the motion to dismiss stage, the Court found that argument, in combination with the alleged pattern of protected activities and adverse actions, sufficient to raise an inference of retaliation. (Mem. & Order on Mot. to Dismiss, Dkt. 28, at 34–35.)  At that time, however, the Court explained that "Defendant is free to raise this issue again at summary judgment if it concludes, following discovery, that the undisputed facts can establish that retaliation was not a but-for cause of [the adverse actions]." (*Id.* at 35 n.25.)  Defendant has done so, and the Court finds, based on the totality of the evidence before it and all of the reasons described herein, that temporal proximity alone is insufficient to raise the necessary inference of causation at this stage, notwithstanding the academic calendar.

connection between those adverse actions and Plaintiff's protected activities. For example, Defendant explains that Professor Robotham was responsible for making faculty schedules. (Def.'s Mem. Supp. Summ. J., Dkt. 50-9, at 6 (citing, *inter alia*, Pl.'s Dep., Dkt. 50-3, 62:19–24).) Plaintiff testified that Professor Robotham was her "biggest ally," (Pl.'s Dep., Dkt. 50-3, 54:14–15); he strongly supported her tenure application, giving her the "highest scores" on his recommendation, (*id.* at 129:3–8); and he advocated on her behalf at the College-wide P&B Committee meeting, (Pl.'s 56.1 Resp., Dkt. 53 ¶ 26; *see also* Pl.'s Dep., Dkt. 50-3, 152:20–53:3 (Plaintiff testifying that Professor Robotham "absolutely" wanted her to get tenure)). This evidence suggests that Professor Robotham did not retaliate against Plaintiff by purposefully creating scheduling conflicts.[19]

In addition, there is no evidence that Professor Robotham—who, again, created the schedule—even knew about Plaintiff's protected activities. He was not listed as a recipient of Plaintiff's January 2017 emails to human resources about the scheduling conflicts, (*see* January 2017 Emails, Dkt. 51-26, at ECF 2–7), nor was he listed as a recipient of the memorandum she sent in February 2017 to report hiring discrimination in the department, (*see* 2/23/2017 Memo, Dkt. 51-23), nor is there any evidence that he was privy to Plaintiff's January 2018 conversation with Dean Rolle. "The lack of knowledge on the part of particular *individual agents* is admissible as some evidence of a lack of a causal connection, countering plaintiff's circumstantial evidence of [temporal] proximity." *Gordon v. N.Y.C. Bd. of Educ.*, 232 F.3d 111, 117 (2d Cir. 2000) (emphasis in original). Similarly, Plaintiff has not pointed to any evidence that would suggest that President Crew's decision was motivated by race or sex apart from the attenuated temporal

---

[19] Professor Robotham passed away, and so he was not able to explain why he created the schedules in the way he did. (Def.'s Mem. Supp. Summ. J., Dkt. 50-9, at 6.)

proximity, which, as described above, is insufficient on its own for a jury to find a causal connection.  This lack of evidence further erodes any inference of a causal connection between Plaintiff's protected activities and the scheduling conflicts she experienced.[20]

In light of the attenuated temporal connection between Plaintiff's protected activities and the adverse actions, Professor Robotham's support of Plaintiff's tenure application and seeming lack of knowledge of her protected activities, and the lack of any non-temporal evidence suggesting that Robotham's scheduling decisions or President Crew's tenure decision were motivated by retaliatory animus, the Court finds that a reasonable jury could not find a causal connection between Plaintiff's protected activities and the adverse actions she experienced.  *See Gorzynski*, 596 F.3d at 101 (explaining that to survive summary judgment, a plaintiff must "show more than 'some metaphysical doubt as to the material facts'" (citation omitted)).  Because a reasonable jury could not conclude that the adverse actions Plaintiff experienced resulted from a retaliatory motive, her retaliation claim must be dismissed.

---

[20] Defendant also argues that Plaintiff, who is Black, cannot overcome the "well-recognized inference against discrimination" that arises when the relevant decisionmakers share the plaintiff's race because all of the relevant decisionmakers here—Professor Robotham, Dean Rolle, and President Crew—are also Black.  (Def.'s Mem. Supp. Summ. J., Dkt. 50-9, at 14 (quoting *Drummond v. IPC Int'l, Inc.*, 400 F. Supp. 2d 521, 532 (E.D.N.Y. 2005)).  But as this Court explained in its Memorandum and Order on the motion to dismiss, this argument "glosses over the fact that Plaintiff is a Black *woman* who is bringing race and gender discrimination claims," based in part on the decisions of Professor Robotham and President Crew, who are Black men.  (Mem. & Order on Mot. to Dismiss, Dkt. 28, at 25 n.19.).  Consequently, the Court does not apply the "inference against discrimination" in its analysis here.

## CONCLUSION

For the reasons stated above, Defendant's motion for summary judgment is granted in its entirety, and Plaintiff's remaining claims are dismissed. The Clerk of Court is respectfully directed to enter judgment and close this case.

SO ORDERED.

*/s/ Pamela K. Chen*
Pamela K. Chen
United States District Judge

Dated: February 27, 2025
Brooklyn, New York